1                   UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF TEXAS
2                         HOUSTON DIVISION

3      *****************************************************************

4      UNITED STATES OF AMERICA        4:20-CR-00026-4

5
       VS.                             HOUSTON, TEXAS
6

7      KHALID ABDULAZIZ                MAY 4, 2020

8      *****************************************************************

9                      EXCERPT OF THE TRANSCRIPT OF
              PRELIMINARY EXAMINATION AND DETENTION HEARING
10                    TESTIMONY OF JAMES SETTELEN
              HEARD BEFORE THE HONORABLE NANCY K. JOHNSON
11                  UNITED STATES MAGISTRATE JUDGE

12     *****************************************************************
       APPEARANCES:
13
       FOR THE GOVERNMENT:            MS. LISA MARIE COLLINS
14                                    MS. JENNIFER STABE
                                      U.S. Attorney's Office
15                                    1000 Louisiana Street
                                      Suite 2300
16                                    Houston, Texas 77002

17
       FOR THE DEFENDANT:            MR. CORDT CULLEN AKERS
18                                    The Akers Firm
                                      3401 Allen Parkway
19                                    Suite 101
                                      Houston, Texas 77019
20
       Official Court Reporter:      Lanie M. Smith, CSR, RMR, CRR
21                                    Official Court Reporter
                                      United States District Court
22                                    Southern District of Texas
                                      515 Rusk
23                                    Room 8004
                                      Houston, Texas 77002
24
               Proceedings recorded by mechanical stenography,
25     transcript produced via computer.

1                        **EXAMINATION INDEX**

                                                    **PAGE NO.**
2

3     **James Settelen**

4            Direct Examination by Ms. Collins...........    3
             Cross-Examination by Mr. Akers.............   41
5            Redirect Examination by Ms. Collins.........   61
             Recross-Examination by Mr. Akers...........   66
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **E X C E R P T**

2          THE COURT:  All right.  So it looks like we've got

3     everyone.  Yes.

4               So this will be the hearing for Mr. Abdulaziz

10:08AM  5     because we don't have the other lawyer on the phone.  I told

6     him 11:00 for Mr. Chapa.

7               So who would we be starting with for a witness?

8          MS. COLLINS:  Your Honor, we're starting with

9     Agent Settelen.

10:08AM  10         THE COURT:  Mr. Settelen, raise your right hand.

11              (The oath was administered.)

12         THE COURT:  All right.

13         MS. COLLINS:  May I proceed, Your Honor?

14         THE COURT:  You may.

10:09AM  15         MS. COLLINS:  Thank you, Your Honor.

16                    **JAMES SETTELEN,**

17    having been duly sworn, testified as follows, to wit:

18                    **DIRECT EXAMINATION**

19    **BY MS. COLLINS:**

10:09AM  20    Q.   Could you please state your name for the record?

21    A.   My name is James Settelen.

22         (Technical interference.)

23    Q.   And could you spell that for the Court?

24    A.   It is S-E-T-T-E-L-E-N.

10:09AM  25         MR. AKERS:  Your Honor, if we could mute the line at

1   Corley, I think that might help.

2           THE COURT:  Mute the what?

3           MR. AKERS:  If we could mute the line at Joe Corley, I

4   think that's where a lot of the background noise is coming

5   from.

6           THE COURT:  Right.  I don't know how to do that.

7           (Technical interference.)

8           MS. COLLINS:  You want me to keep going or wait?

9           THE COURTROOM MANAGER:  So I have a question.  So the

10:10AM  10  agents that are appearing by video, did they dial in by video

11  and phone because that's probably where that extra noise is

12  coming on?  You either have to be on one or the other.  You

13  can't be on both.

14               (Off-the-record discussion.)

10:11AM  15          MS. COLLINS:  All right.  May I proceed, Your Honor?

16          THE COURT:  Yes.  And, Mr. Abdulaziz, if you could

17  raise your hand if you can still hear us.

18               Okay.  Go ahead, Ms. Collins.

19          MS. COLLINS:  Yes, Your Honor.

20  BY MS. COLLINS:

21  Q.   Agent Settelen, could you let us know where you work --

22  who you work for?

23  A.   I'm a special agent with the Bureau of Alcohol, Tobacco,

24  Firearms and Explosives.

10:12AM  25  Q.   And how long have you held that position?

A.    Since 2015.

Q.    All right.  As part of your current role with ATF, you do a lot of work with FFLs?

A.    Yes, I work firearms trafficking investigations right now.

10:12AM  Q.    All right.  I want to kind of jump right into things.

At some point did you become familiar with an FFL called Zeroed in Armory?

A.    Yes, I did.

Q.    And can you tell us how that came about?

10:12AM  A.    I was investigating a separate investigation of firearms trafficking of an individual named Roger Levias; and through physical surveillance of Mr. Levias and another known associate, we observed them go to Zeroed in Armory and purchase a firearm.

10:13AM  Q.    All right.  In the course of that investigation, did you become aware that there were actually multiple investigations involving Zeroed in Armory?

A.    Yes, I became aware that there were approximately eight open firearms trafficking investigations where individuals were

10:13AM  purchasing firearms from Zeroed in Armory.

Q.    Looking into those other investigations as well as your own, was there certain red flags that appeared about the number or way in which firearms were being purchased from Zeroed In?

A.    Yes, I reached out to Mr. Abdulaziz about the firearms

10:14AM  purchase by Roger Levias and the other individual named David

1    Lara and I received 4473s, which are firearms transactions

2    records, to where Levias and Lara purchased three

3    Barrett .50 caliber rifles as well as several other firearms,

4    which was significant because neither Lara or Levias had the

10:14AM    5    financial means through their Texas wage reports to be able to

6    afford a weapon that cost that amount of money.

7    Q.    When you say, "that amount of money," what kind of money

8    are we talking about?

9    A.    An 82A1, I think they were being sold by Zeroed in Armory

10:14AM    10    for approximately $7500 each, so three of those between the two

11    of them.   And then there are other larger .50 caliber rifles

12    being sold there up to approximately $15,000 each.

13    Q.    All right.  Was there anything about the type of weapon,

14    a .50 caliber, that stood out to you?

10:15AM    15    A.    A .50 caliber weapon is a large firearm, but it's also a

16    weapon of choice that is known to me that is a weapon of choice

17    by firearms or by cartel members that is often trafficked

18    across the border into Mexico.

19    Q.    All right.  Now, that was your investigation.  You said

10:15AM    20    that there were at least seven other open investigations linked

21    to Zeroed In; is that correct?

22    A.    Yes.

23    Q.    All right.  Did you connect with the agents involved in

24    those investigations to learn more about what evidence there

10:15AM    25    was?

1   A.   Yes.  I read reports, and I spoke to each of the case

2   agents involved in each one of those cases.

3   Q.   All right.  When you started looking into each of those

4   investigations, can you tell us what red flags came up

10:15AM   5   concerning the type of weapon and the way those weapons were

6   being purchased?

7   A.   Yes.  So one of the things that I did early on was I had

8   financial analysis run of financial records tied to Zeroed In

9   Armory.  And one of the things that I saw that stood out was in

10:16AM   10   2017 the banks are required to file cash transaction records or

11   reports any time somebody deposits in excess of $10,000 at one

12   time.

13         In 2017, it appeared that there was only one of those

14   transactions that took place for about $10,700.

10:16AM   15         In 2018, the amount of cash transactions over $10,000

16   deposited by Zeroed In Armory was in excess of $100,000.

17         Then the next year in 2019, the cash transactions of over

18   $10,000 was in excess of $750,000.

19         So this stood out to me as a large increase in firearms,

10:17AM   20   at least suspected that he was taking in cash for firearms

21   instead of electronic method of payment.

22   Q.   All right.  Now, you said in your case concerning Levias

23   that you ran his wage reports and he didn't seem to have the

24   income to purchase these types of weapons.

10:17AM   25         Did you do the same type of investigation with regard to

1    the other seven cases?

2    A.    Either I did it or someone associated to those cases

3    looked up those records.

4    Q.    Okay.  Similarly to your investigation, did it also appear

10:17AM  5    that in those cases those individuals didn't have the type of

6    cash to purchase the quantity of weapons and the type of

7    weapons that they were purchasing from Zeroed In?

8    A.    Yes, there were.  So the most recent investigation is to

9    an individual named Nathaniel Clair.  And Clair, it's reported

10:18AM  10    to me that he is unemployed; but he was able to purchase over

11    approximately 247 firearms from Zeroed in Armory.

12    Q.    And when you say 247 firearms, can you give us an idea of

13    whether that happened over years or months or in one or two

14    days?  How did that come about?

10:18AM  15    A.    Yeah.  Well, Nathaniel Clair's firearms purchases, they

16    were mainly over the -- I think the past -- the previous six

17    months.  But what was significant about his is there were a lot

18    of pistols being purchased, but also six Barrett .50 caliber

19    rifles were purchased that were recovered in Mexico in a home

10:18AM  20    associated to a high-level cartel lead.

21    Q.    All right.  And how do we get that information that

22    firearms were found in Mexico?

23    A.    Mexican authorities recover firearms and sometimes they

24    trace them in our National Tracing Center here that's run by

10:19AM  25    the ATF.  It's an electronic tracing system that will give

1    information on where that firearm, the importer, manufacturer,

2    and distributor and then ultimately the Federal Firearms

3    Licensee that received that firearm and then they can contact

4    them to see who they sold that firearm too.

10:19AM  5    Q.    Okay.  And that's how you determined that at least six

6    Barretts bought by Clair ended up in Mexico in a cartel

7    facility?

8    A.    Well, either through ATF 4473 forms, which are the firearm

9    transaction records at the FFL or through another reporting

10:20AM  10    system that are multiple sale reports.

11         So any time somebody purchases more than two pistols or

12    more than two long guns in a five-day period from the same

13    federal firearms dealer, then the dealer is required to submit

14    a multiple sale form on that individual that comes to ATF that

10:20AM  15    we're able to view suspicious transactions in an effort to

16    combat firearms trafficking.

17         There's an exception to that rule and that is if you are a

18    manufacturer.  If the FFL becomes a manufacturer of firearms,

19    they're exempt from filing that form on long guns only, but

10:20AM  20    they still have to file it on pistols.

21         So in Nathaniel Clair's case, those forms were being filed

22    by Zeroed in Armory and ATF was getting notified of all of the

23    firearms purchases that he was making from there as well as

24    some other FFLs.

10:21AM  25    Q.    All right.  When you have an investigation with large

1  amounts of guns like in Nathaniel Clair's case, is it normal

2  practice to approach the FFL -- in this case, Zeroed In

3  Armory -- and talk to them about the records they're keeping

4  and the individuals that they have sold weapons to?

10:21AM 5  A.    It is normal practice to do that; however, in the case

6  against Nathaniel Clair, ATF decided to hold off on reaching

7  out to Zeroed in Armory due to the fact that there was

8  information they he was associated to other firearm trafficking

9  organizations and we didn't want to notify the FFL that we were

10:21AM 10  investigating Clair at the time.

11  Q.    Okay.  Let's talk about those other investigations you

12  were talking to.

13        At some point did you come into contact with or become

14  familiar with someone by the name of Camacho?

10:21AM 15  A.    Yes.

16  Q.    And I'm completely drawing a blank right now.  Can you

17  give us his full name?

18  A.    Victor Camacho.

19  Q.    All right.  And when did you first learn about

10:22AM 20  Mr. Camacho?

21  A.    I learned about Camacho -- there was one of my coworkers,

22  another case agent, was working a firearms trafficking

23  investigation that involved Camacho.

24  Q.    All right.

10:22AM 25  A.    And I was -- so more specifically on Camacho, he was

1    arrested in Brownsville and Brownsville Police Department

2    arrested him for, I believe in connection to a shooting.  And a

3    pistol was recovered, and it was traced through the National

4    Tracing Center to a woman named Ashley Giddens.

10:23AM    5        And so I had that information, and then Camacho was pulled

6    over in another traffic stop.  He was bonded out and he was

7    pulled over in Fort Bend County and deputies found him in

8    possession of a .50 caliber rifle with an obliterated serial

9    number.

10:23AM   10        And myself and another case agent responded to the scene

11   of that traffic stop where they had Camacho in custody.  He was

12   moved to a police facility, and I was able to interview Camacho

13   in association with possession of that firearm.

14   Q.    Let's talk about those one at a time.  You said on the

10:23AM   15   December 5th arrest he was found with at least a pistol that

16   came back to an Ashley Giddens; is that right?

17   A.    Yes.

18   Q.    In that same transaction or that same traffic stop, were

19   there also other firearms found in the vehicle?

10:23AM   20   A.    Yes.  There were -- so there were, I believe, four

21   308 AR-type rifles that were broken down into uppers and

22   lowers, which is an indicator of firearms trafficking to

23   smuggle those items.

24        And then I think there were some magazines as well in the

10:24AM   25   vehicle.

Q.    Okay.  When you ran those firearms, did those come back as purchased by someone else?

A.    Yes.  Israel Chapa came back as a purchaser.

Q.    All right.  Let's talk about those individuals one at a time.

When you became familiar with Israel Chapa through Camacho's arrest, did you start looking into him and the manner and type of weapons he was purchasing?

(Technical interference.)

A.    I'm sorry.  I'm having trouble hearing you.  There's a lot of static and paper moving around.

Q.    I'm sorry.  I'll speak up a little bit.

A.    I am wondering who else may need to be muted.

Q.    Let me just speak up for you, okay?

When the Camacho arrest occurred and you found that some of those guns were purchased by Israel Chapa, did you begin to investigate him?

A.    ATF did.  Another case agent began.  Actually Christopher Wilhite who is here with us and then also Jarod Cardona began investigating Chapa and Camacho and other associated individuals.

Q.    When you started looking at Israel Chapa -- I say you -- ATF began looking at him, was there another one of these situations where it looked like large numbers of cartel-style firearms were being purchased by Israel Chapa?

A.    Yes.  There were over 150 firearms purchased by Chapa from Zeroed in Armory that cost approximately over $245,000 in about a six-month time frame.

Q.    Similar to these other investigations, was it clear from Chapa's work records that he did not have the means to buy that number and type of weapon?

A.    Yes.

Q.    All right.  Similar to these other investigations, did it become clear that at least some of those weapons purchased by Chapa ended up in Mexico or were recovered in Mexico?

A.    Yes.

Q.    All right.  Now, similarly when the other pistol in Camacho's car was found coming back to Ashley Giddens, did you start to look into her as well?

A.    Yes.

Q.    And with regard to Giddens, did she, in fact, agree to speak with ATF about the firearms that she had purchased?

A.    Yes, she was interviewed.

Q.    All right.  Can you tell us a little bit about what she told you as far as who she was working with and how she went about purchasing the firearms from Zeroed In?

A.    So at the time Israel Chapa had already been interviewed by ATF and so it's believed that Ashley Giddens knew that ATF had talked to him.  So she at the time said that she was being directed by Chapa to purchase firearms from Zeroed in Armory.

And one of the significant things that she said was that she didn't know what firearms she was necessarily picking up from Zeroed in Armory, that she was given money and she would show up and Mr. Abdulaziz would already have those firearms ready.  She would hand over the wad of cash and then pick up -- fill out the forms, pick up the guns and leave without ever ordering them or knowing what she was picking up at the time, which is a huge indicator of firearms trafficking.

Q.    All right.  So to be clear, according to Ashley Giddens, she never placed any official orders for these firearms?

A.    I don't know if I would go that far.  I don't know if she would place any orders, but I know that in the interview she did say that they were being ordered or she was obtaining them on behalf of Chapa at the time.

Q.    All right.  According to her, when she would enter Zeroed In, was it always the defendant here that she would interact with?

A.    Yes.

Q.    All right.  In fact, I assume you did surveillance of Zeroed in Armory in the course of your investigation, right?

A.    I did.

Q.    Would it be fair to say that that was dozens of hours, if not more, of physical and video surveillance?

A.    Yes.  Days --

Q.    Go ahead.

1    A.    Approximately over a month of surveillance.

2    Q.    And during that time did you ever see any other employee

3    of Zeroed in Armory other than this defendant?

4    A.    I did not.  And it can be noted that the defendant is the

10:29AM  5    sole listed managing member of the LLC, which is Zeroed in

6    Armory.  There's no one else listed on there.

7    Q.    All right.  And when Ms. Giddens picked up firearms, did

8    she tell you kind of the quantity?  Was it just a few here, a

9    few there?  Large numbers?  What are we talking about?

10:29AM  10    A.    She had a significant number of firearms, but it wasn't a

11    huge number.  It was, I think, in the twenties.  I don't recall

12    off the top of my head exactly how much, but she would pick up

13    in the twenties.

14    Q.    All right.  And when she would enter Zeroed In to pick up

10:30AM  15    these firearms, was it her testimony that the defendant here

16    already knew what she was there to pick up?

17    A.    Yes.

18    Q.    Okay.  In the course of that arrest as well as the arrest

19    on December 19th -- actually let's talk about the December 19th

10:30AM  20    arrest for just a minute.  You said that there was

21    a .50 caliber firearm found in Camacho's car on that date?

22    A.    Yes.

23    Q.    All right.  And were you able to determine who had

24    purchased that firearm?

10:30AM  25    A.    Yes, it was the -- let me -- I'm trying to remember who

1    that was traced to.

2    Q.    Does the name Cavazos sound familiar?

3    A.    Yes.  So Javier Cavazos.

4    Q.    All right.  In the course of these two arrests, were you

10:31AM  5    able to obtain phone downloads from Camacho's phone?

6    A.    Yes.  You're talking about the two arrests of Camacho,

7    correct?

8    Q.    Yes, sir.

9    A.    Yeah.  So there were his phone in Brownsville and his

10:31AM 10   phone at the time of the arrest when he was arrested by ATF for

11   the obliterated serial number .50 cal.  Those were downloaded,

12   and there were a significant number of conversations with other

13   individuals about firearms trafficking.

14   Q.    Okay.  When you say, "firearms trafficking," specifically

10:31AM 15   were there phone conversations on Mr. Camacho's phone regarding

16   Mexican sources that they were supplying?

17   A.    Yes.

18   Q.    All right.  Now, specific to why we're here today, was

19   there anything in the course of those phone conversations that

10:32AM 20   had to do with this defendant?

21   A.    Yes.  There was a video on Camacho's phone.  So the

22   conversations that Camacho was having was identified as being

23   with a phone number associated to an individual named

24   Isaac Rodriguez.

10:32AM 25        Isaac Rodriguez is -- they had significant conversation

about lists of firearms, sale of firearms, how much they cost,
firearms going to Mexico, and the people down there wanting to
know that information.  They sent pictures back and forth as
well as video.

10:32AM      And in one of the videos, there's a video inside Zeroed in
Armory where Mr. Abdulaziz has asked Isaac Rodriguez if the
money is ready for the firearms to which there's a reply that,
yeah, it will be ready tomorrow.  And there were a large number
of firearms that appeared to be in boxes within Zeroed in
10:33AM  Armory.

Q.    Okay.  I want to be really clear.  To be fair, when you're
talking about conversations about firearms going to Mexico,
those conversations are between Mr. Camacho and Mr. Rodriguez;
is that correct?

10:33AM  A.    Yes.

Q.    All right.  And when Mr. Camacho asked Mr. Rodriguez for
firearms to go to Mexico, do we see in the course of phone
tolls that when Rodriguez says he's got the guns he's, in fact,
in contact with Zeroed in Armory?

10:33AM  A.    He is.  He's in significant contact with Zeroed in Armory
to, you know, place those orders based on information from
testimony of other people.

Q.    All right.  And when you talk about this video that is on
Mr. Camacho's phone, it displays both Mr. Rodriguez as well as
10:34AM  the defendant here; is that correct?

A.   The voice of Mr. Abdulaziz is heard asking about the money in the background.

Q.   All right.  And from the video and your investigation, can you tell where that video was taken?

10:34AM   A.   It was taken inside Zeroed in Armory.

Q.   Okay.  So direct contact between this defendant and Mr. Rodriguez?

A.   Yes.

Q.   Right.  Now you mentioned that you were already familiar
10:34AM   with Isaac Rodriguez, correct?

A.   I think that we learned about him through those phone downloads.

Q.   Okay.  Fair enough.

Did Mr. Rodriguez himself have any firearm purchases from
10:34AM   Zeroed In?

A.   Not that I know of.  He hasn't purchased any firearms from there, and that's consistent with the interview with Mr. Abdulaziz where he doesn't purchase firearms from Zeroed In.

10:35AM   Q.   Okay.  So all the firearms related to Isaac Rodriguez are purchased by some other individual?

A.   Yes.  Isaac Rodriguez would direct people to go to Zeroed in Armory and purchase firearms, and then those firearms were ending up in large quantities in Mexico.

10:35AM   Q.   All right.  Let's talk about -- you mentioned that you had

individuals giving you this information.  Let's talk about one

of those individuals.  Are you familiar with a

Steven Baranowski?

A.    Yes.

Q.    Okay.  Who is Steven Baranowski?

A.    He was a purchaser of firearms for Isaac Rodriguez.  He

went to Zeroed in Armory on several occasions and purchased

firearms for them and had firearms recovered in Mexico as well.

Q.    All right.  Do you know the number of firearms found in

Mexico?

A.    I don't recall off the top of my head exactly how many

Baranowski had recovered.  They're fairly recent because his

purchases took place at the beginning of March and those

recoveries were already recovered in Mexico within a matter of

weeks after his purchases took place.

Q.    All right.  So fairly short time frame between purchase

and recovery in Mexico?

A.    Right.  Which was consistent with the same thing when we

found Javier -- or Camacho in possession of the .50 cal with

the obliterated serial number, that firearm was purchased by

Javier Cavazos just one day prior to that recovery taking

place.

Q.    All right.  With regard to Steven Baranowski, did you-all

approach him for an interview?

A.    Yes.

1    Q.    Did he agree to speak with you?

2    A.    He spoke with, yes, other agents, not myself.

3    Q.    All right.  But you're familiar with that interview?

4          JOE CORLEY OFFICER:  Excuse me.  I'm sorry.  He would

10:37AM  5    like to go to the restroom real quick.  Just a quick second.

6                        (Court is in recess.)

7          THE COURT:  All right.  It looks like Mr. Abdulaziz is

8    back, so let's proceed.

9          MS. COLLINS:  Am I good to go?

10:42AM  10          THE COURT:  (Nodding head affirmatively.)

11          MS. COLLINS:  Thank you, Your Honor.

12    BY MS. COLLINS:

13    Q.    You mentioned that Steven Baranowski agreed to speak with

14    you.  Can you tell us what he told you with regard to this

10:42AM  15    defendant and Zeroed in Armory?

16    A.    Well, Baranowski said he was purchasing firearms for

17    Isaac Rodriguez and he got paid for each firearm that he

18    purchased.

19    Q.    Similar to the situation with Ashley Giddens, did

10:43AM  20    Baranowski also describe basically showing up and being given

21    firearms?

22    A.    Yeah, he had mentioned that he showed up thinking he was

23    getting one number of firearms and then Abdulaziz told him, no,

24    you're picking up this many today and he got more firearms than

10:43AM  25    he originally thought he was going there to pick up.

Q.    And who was giving him the money to make these purchases?

A.    That would be Isaac Rodriguez.

Q.    All right.  When you spoke to Baranowski, did he make clear whether or not he understood that the firearms he was picking up were going to Mexico?

A.    Yes, he did.  He mentioned several times that he knew they were going to Mexico.

Q.    And similar to Ashley Giddens, was it clear that he himself had not purchased any of the firearms he was picking up from Zeroed In?

A.    Yes.  Rephrase that for me.

Q.    Yeah.  Sure.

A.    The firearms -- he wasn't the sole intended recipient of the firearms.

Q.    Okay.

A.    Yes.

Q.    Okay.  So when he was picking up firearms on behalf of Isaac Rodriguez, he was not placing those orders; is that correct?

A.    That's correct.

Q.    Now, we've only talked about approximately four of the investigations going on with Zeroed in Armory; but would it be fair to say that there were additional investigations with similar MOs as what we've just discussed?

A.    Yes.  The investigations have -- the purchase of firearms

1    by individuals without the financial means to afford them and

2    their weapons of choice like AK-type rifles, AR-type rifles and

3    large .50 caliber rifles that are known to me to be firearms of

4    choice for trafficking to Mexican cartels.

5    Q.    And when we're talking about the number of firearms

6    purchased from Zeroed In that have been recovered in Mexico in

7    2019, what is that number so far?

8    A.    The last time I checked it, it was around 30 firearms and

9    the reason why that is significant is because based on my

10   records search of eTrace, which houses all of those records,

11   there's only 35 firearms that have been recovered in Mexico

12   that were purchased from Zeroed in Armory historically.

13        So that large number of firearms within just one year in

14   association to the large number of cash deposits being made by

15   Zeroed in Armory in the calendar year 2019 indicated to me that

16   there were individuals purchasing firearms with cash and there

17   was a spike in association to that cash or those firearms being

18   purchased with the number of firearms actually being recovered

19   in Mexico.

20   Q.    All right.  In the course of your investigations, was

21   there ever a time where you or other members of ATF approached

22   Khalid about any of these investigations?

23   A.    Yes.  Special Agent Jarod Cardona talked to Abdulaziz at

24   least one time in reference to Israel Chapa and Ashley Giddens.

25   Q.    All right.  When speaking with the defendant, did

1   Agent Cardona make it clear that these were individuals that

2   were under investigation?

3   A.   Yes.

4   Q.   And did he, in fact, ask the defendant to call him if

10:46AM  5   these people showed up again to purchase firearms?

6   A.   Yes.

7   Q.   I assume he gave him a card or a number or something for

8   him to be able to reach Agent Cardona?

9   A.   Yes.

10:47AM  10   Q.   Did Agent Cardona ever hear from the defendant?

11   A.   Not to my knowledge.

12   Q.   To your knowledge did anyone from the ATF ever hear from

13   the defendant again?

14   A.   No.

10:47AM  15   Q.   Nevertheless, from your records searches, did Mr. Chapa as

16   well as Ms. Giddens make purchases at Zeroed In after that

17   conversation with Agent Cardona?

18   A.   I believe that they -- Isaac Rodriguez was still directing

19   individuals to go to Zeroed in Armory; but those purchases were

10:47AM  20   then made by other individuals like Steve Baranowski.

21        So they started using other people whenever ATF came

22   around and started asking questions about a certain person who

23   was straw purchasing those firearms.

24   Q.   In the course of Agent Cardona's conversation with the

10:48AM  25   defendant, did he make it clear that he wanted the defendant to

1    call him when these large number of firearm purchases were

2    made?

3    A.    Yes.

4    Q.    And, again, did he ever hear from him?

10:48AM   5    A.    Not to my knowledge.

6    Q.    After seeing all of these investigations with the same MO

7    occurring, did you make the decision, along with other agents

8    with ATF, to do essentially an undercover operation?

9    A.    Yes.

10:48AM   10    Q.    Can you tell us about that?

11    A.    So I began investigating Zeroed in Armory directly and to

12    attempt to uncover any association to all of these firearms

13    trafficking cases that were taking place in the Houston area.

14          And one of the things that I did -- well, several things

10:48AM   15    that I did, but we utilized confidential informants to actually

16    enter Zeroed In Armory and make purchases from Abdulaziz.

17    Q.    All right.  And who did you use for those operations and

18    why?  What type of individuals?

19    A.    One confidential informant is a convicted felon and he was

10:49AM   20    prohibited due to his criminal history and could not purchase

21    firearms bypassing an FBI background check and the second

22    individual could purchase firearms and so we sent them both in

23    together to make those purchases.

24    Q.    And I guess before we go any further, Zeroed in Armory, is

10:49AM   25    it located in the Southern District of Texas?

1    A.    It is.

2    Q.    All right.  When was the first time that you sent these

3    CIs into Zeroed In?

4    A.    March 27th.

10:49AM  5    Q.    Okay.  And when they entered, did you have them wired up

6    so that you would be able to record the conversations and go

7    back and confirm what they told you had happened?

8    A.    Yes.

9    Q.    Okay.  And did you yourself also have conversations with

10:50AM  10   each of them after each operation to go over what had occurred

11   inside?

12   A.    Yes.

13   Q.    Along with that, did you have individuals -- did anybody

14   have eyes on Zeroed in Armory during this time?

10:50AM  15   A.    Yes, we had surveillance.  We were close by and we were

16   monitoring the active transmission of what was taking place

17   while it was happening.

18   Q.    All right.  Can you tell us about the first encounter

19   between the defendant and the CIs?

10:50AM  20   A.    The CI-1 was -- the convicted felon placed a phone call at

21   my direction to Zeroed in Armory a day prior to the operation

22   and asked about firearms in stock and made an appointment to

23   arrive.  The CI then arrived at the location, and CI-1 and CI-2

24   both entered the premises together.

10:51AM  25         CI-1 asked about firearms in stock, looked at several

1    firearms and said that he wanted to purchase those firearms

2    from Abdulaziz.

3        Go ahead.

4    Q.    Sorry.  How many firearms was CI Number 1 asking to

10:51AM  5    purchase?

6    A.    Two firearms.

7    Q.    At this point when he says he wants to purchase these

8    firearms, has all the talk been between CI-1 and the defendant?

9    A.    Yes.

10:51AM 10    Q.    All right.  Is it clear from the conversation up to this

11   point that it is CI Number 1, the felon, who wants to purchase

12   these firearms?

13   A.    Yes.

14   Q.    Okay.  What happens at that point where he makes the

10:52AM 15    gesture to purchase the firearms?

16   A.    Abdulaziz asks him if he has a Texas license to carry.

17       CI-1 says, "No."

18       He says, "Do you have a driver's license?"

19       CI-1 hands his driver's license to Abdulaziz at which time

10:52AM 20    CI-1 asks Abdulaziz "Hey.  What are you going to do with

21   that -- my driver's license?"

22       Abdulaziz said, "I'm going to run your background check."

23       And at that point CI-1 says, "I've got to be honest with

24   you.  I'm a felon."

10:52AM 25       And Abdulaziz responds, "So you're not going to pass a

1    background check then, are you?"

2         And CI-1 says, "No."

3         And he looks at CI Number 2 who has not said anything

4    about the firearms and asks if CI-2 is at least 18 years of

10:52AM 5    age, which is significant because you have to be 18 years of

6    age to purchase a rifle, but you don't have to be -- or you

7    have to be 21 years of age to purchase a pistol and both of

8    these firearms were rifles.

9    Q.   All right.  Did she respond in the affirmative that she's

10:53AM 10   the right age?

11   A.   Yes.

12   Q.   All right.  And what happens then?

13   A.   Abdulaziz discusses with them and says, "The firearms have

14   to be for you.  You can't purchase firearms for anybody else,

10:53AM 15   just so you understand that."

16        And he kind of gives a disclaimer about that situation if

17   she's going to buy the guns.  But he ultimately says, "However

18   you guys want to do it."

19        And then CI-2 fills out the paperwork, and the background

10:53AM 20   check is conducted on CI-2 to purchase the firearms.

21   Q.   All right.  When it comes time to pay for those

22   firearms -- and how many were there?

23   A.   There were two firearms.

24   Q.   All right.  When it comes time to pay for those, who

10:54AM 25   actually hands over the money?

A.    CI Number 1.

Q.    The felon?

A.    The felon.

Q.    All right.  And what's significant -- well, let me back

10:54AM   up.  Is there actually a place on the 4473 or -- excuse me --

the form you have to fill out to obtain a firearm that

discusses who is paying for that firearm and who it's on behalf

of?

A.    Yes, on the 4473, the very first question that it asks is

10:54AM   Question 11(a) in reference to the firearms and it asks if

you're the actual transferee or buyer of the firearm.

        And then further down, there are three pages of

instructions on ATF 4473 that break down each of the questions

that it asks and what those mean with definitions, notices, and

10:54AM   gives examples.

        On Question 11(a), there's an example given of where

Individual 1 wants to purchase a firearm, but the money -- or

asks another individual to purchase the firearm, but the money

is not that individual's and explains that an FFL is not

10:55AM   allowed to transfer firearms to an individual who is not the

intended -- the actual transferee or buyer of the firearm and

who is buying the firearms and the money is not theirs.

        So by CI-2 filling out the paperwork and doing the

background check, but CI-1 paying, the money is not CI 2's and

10:55AM   therefore that's a straw purchase that -- and relying on that

1    form on that -- checking that box, the FFL is not allowed to

2    transfer that firearm to CI-1 or CI-2.

3    Q.    And is this information that as the owner of an FFL who's

4    been working as an FFL for five years would be expected to

10:55AM  5    know?

6    A.    Yes, absolutely.

7    Q.    All right.  Now the felon pays in cash for these firearms

8    after the other CI fills out all the paperwork.  Who are the

9    firearms actually handed to?

10:56AM  10    A.    Well, prior to that, Abdulaziz tells CI-2 that CI-2 cannot

11    give the firearms to CI-1 because that's -- you know, you can't

12    buy firearms for someone else and makes that very clear.

13          Then Abdulaziz transfers -- physically transfers the

14    firearms to the felon by handing the firearms to -- one of the

10:56AM  15    firearms out of a box and then another he places in a box and

16    hands to the felon to exit the premise.

17    Q.    All right.  And does he, in fact, exit the premises with

18    both of those firearms?

19    A.    Yes.  CI-2 did not carry the firearms out of the building.

10:56AM  20    Q.    All right.  In the course of that first conversation

21    between the felon and the defendant, was there conversation

22    about additional purchases down the road?

23    A.    Yes.

24    Q.    Can you tell us about that?

10:57AM  25    A.    They discuss the purchase of a .50 caliber rifle and CI-1

1    said he would be back for that and Abdulaziz says, "Yeah, it

2    would be fun to have."

3    Q.    And, again, that conversation is happening between the

4    felon and the defendant?

10:57AM  5    A.    Yes.

6    Q.    Is the non-felon involved in that conversation in any way?

7    A.    No.

8    Q.    All right.  Do you, in fact, set the felon up to return to

9    Zeroed in Armory?

10:57AM  10   A.    Yes.

11   Q.    And can you tell us the approximate time frame -- or when

12   does the next encounter occur?  What date was that?

13   A.    April 16th.

14   Q.    So about two weeks later?

10:58AM  15   A.    Yes.

16   Q.    And between -- in that two-week time frame, are there

17   additional conversations that take place between the felon and

18   our defendant here?

19   A.    Yeah.  There are phone calls that take place.

10:58AM  20   Q.    Is that about setting up for the felon to return and

21   purchase more weapons?

22   A.    Yes.

23   Q.    Okay.  In April -- can you tell us kind of what goes down

24   in that encounter?  Do both CIs enter the building at that

10:58AM  25   time?

A.    Yes.  So CI Number 1, the felon, calls Zeroed in Armory

and speaks to Abdulaziz on April 15th and a series of phone

calls take place back and forth.

On one of those phone calls, Abdulaziz states that he has

a firearm that he can sell to CI-1 that is a private party sale

so he won't have to conduct any paperwork on that firearm or he

doesn't want to have to pay any taxes.  They also discuss

putting down a deposit on the .50 caliber rifle.

Q.    Okay.  Let's take those one at a time.

With regard to the .50 caliber rifle, similar to the first

encounter, is that a transaction that would require the

purchaser's criminal record to be run?

A.    Yes.

Q.    Okay.  Similar to the first time, does the defendant have

the second CI fill out the paperwork?

A.    Yes.

Q.    All right.  Similar to the first time, is it actually the

felon who hands over the money for that purchase?

A.    Yes.  So, well, the .50-caliber rifle, the deposit was put

down on that during the second transaction, during the second

operation undercover contact, but then that firearm was

actually -- the paperwork was filled out and the background

check and everything on April 28th.  So just the deposit was

placed for that firearm on April 16th.

Q.    All right.  And that was given over or handed over by the

felon?

A.    That money, yes.  On April 16th, the deposit was given to Abdulaziz for that weapon by the felon.  However, Abdulaziz placed the invoice for that firearm in CI 2's name and CI-2 was not in the building at the time.

Q.    Okay.  So she wasn't even there when that conversation was being had?

A.    That's correct.

Q.    All right.  Similarly you mentioned a firearm without paperwork.  Can you explain that to us -- what that means?

A.    Yes.  So an FFL is required to log in the Acquisition and Disposition book of their business of the Federal Firearms Licensee, all firearms that they take in; and this includes firearms that are being sold on behalf of other people on consignment.

     They're required to log it in to their book within 24 hours after receipt and I think seven days after the sale, of the disposition of that firearm.  So any time that firearm mistake comes in, that it has to be logged in to that book.

Q.    All right.  What happened between the defendant and the CI, the felon, that would be problematic with the rules you've just stated?

A.    So the Acquisition and Disposition book can't have that firearm listed in it because there was no ATF Form 4473 or background check associated to that firearm.  So that would be

a huge violation of lying in the records of an FFL, records required to be kept by an FFL if Abdulaziz did, in fact, fail to place that firearm in the A&D book.

Oftentimes what we see in firearms trafficking is FFLs will sell used firearms off record without completing the proper forms and background check because there's typically no way to trace that firearm to an FFL.

In contrast to a brand new firearm that's ordered from a manufacturer or distributor, that firearm has a paper trail and shipment records and purchase that can be tracked by ATF to the FFL.

So typically you don't see brand new firearms being sold without completing the background check because at some point ATF will do an audit of the records and find that transaction in the inspections that are done at the FFL and so only used firearms without the record of receipt are sold without completing paperwork generally.

Q.   Whether or not the paperwork was filled out or not, would the defendant have been able to sell to a felon?

A.   No.

Q.   All right.

A.   It's a violation of 922(d)(1) to transfer or sell a firearm to anybody with reasonable cause to believe that they are a felon or prohibited and have been convicted of a crime with a term exceeding one year.

Q.   All right.  Let me ask you this.  We've talked a lot about all of these investigations with firearms ending up in Mexico that were purchased from Zeroed in Armory.  When you sent the CI in, the felon, at any point was the discussion of purchases being taken to Mexico, did that conversation ever come up?

A.   Yes.  CI-1 told Abdulaziz that his boss wanted him to take the firearms to Mexico.

Q.   So the felon tells this defendant he's taking guns to Mexico?

A.   Yes.

Q.   What happens?  I mean what is the defendant's response to that?

A.   Abdulaziz tells him -- asks him if he's serious, that he can't take the guns to Mexico, that's a huge federal violation, and he's not allowed to sell to him if he tells him that.

Q.   Does the CI, the felon, ever say, "Oh, never mind then. I'm not going to take them there"?

A.   No, he just mentions that, you know, "All right.  Yeah, well, they'll get paid to do that."

So he never denied the intent.

And then he immediately places a phone call and speaks in Spanish and then asks Abdulaziz further questions about another firearm on the wall and then speaking to somebody else in Spanish relaying that information and hangs up and says, "I'll take that one, too."

Q.    All right.  And at that point does the defendant say, "No,
I can't sell these items to you"?

A.    No.

Q.    Does he, in fact, sell the items to the felon?

A.    Yes.  The felon was the only one in the building.  He
paid -- at the time he paid for the firearm that no background
check was conducted on and no paperwork was filled out for.

        Later in the conversation when the receipts are being
handed over, he says, "I can't give you a receipt for that one
because we're not the ones selling it and, you know, that's --
there's no record of that --

                    (Technical interference.)

        THE COURT:  All right.  This is Judge Johnson.  Who
just joined the line?

        MS. COLLINS:  Agent Settelen, are you still there?

        THE WITNESS:  I am.  I'm still here.

        THE COURT:  We've lost you on video.

        THE WITNESS:  What's that?

        THE COURT:  We've lost Agent Settelen on video.

        THE WITNESS:  Oh, really?

        MS. STABE:  On mine, it says there's a camera with an X
through it.  I think he might have turned off his camera.

        THE COURT:  We can hear you, but turn on your camera.

        THE WITNESS:  My camera is on.

        MS. STABE:  There you are.

                    THE COURT:  All right.  We're all good.  All right.

                    MS. COLLINS:  I'm almost done, Judge.  Just a couple of

more questions.

**BY MS. COLLINS:**

Q.    Agent Settelen, did you run a search warrant on Zeroed in

Armory?

A.    I did.

Q.    And when did that occur?

A.    On April 29th.

Q.    And on that date, while you were there executing the

search warrant, was there actually a delivery of a large number

of firearms?

A.    Yes, there was a UPS freight truck arrived with two

pallets of firearms at the weight of approximately

1,000 pounds.

Q.    And the number of firearms?

A.    There were 105 complete firearms from

Anderson Manufacturing as well as an additional 22 lower

receiver -- Anderson lower receiver firearms that did not have

uppers attached to them, so 127 in total.

Q.    On that same date when that warrant was executed, did you

have an opportunity to speak to the defendant?

A.    I did.

Q.    All right.  And did he explain who those firearms were

for?

1    A.    Yes.  He said that Isaac Rodriguez ordered those firearms

2    and an individual named Reyna was supposed to come pick those

3    up.  That individual was identified as a Mario Reyna.

4    Q.    All right.  And how were you able to identify Mario Reyna?

11:09AM   5    A.    I looked through the records that we took from Zeroed In

6    Armory and found ATF Forms 4473 associated to the individual

7    with other purchases.

8    Q.    And if you know, the prior purchases that Mario Reyna

9    made, were they also large quantities like the 105 he was to

11:09AM   10    pick up on the day of the warrant?

11    A.    I haven't had a chance to pull all those firearms off and

12    put them in a spreadsheet yet so I don't know exactly how many,

13    but I know there were multiple 4473s from purchases and there

14    was information where they obtained from phone tolls where that

11:10AM   15    phone number associated with that individual was in contact

16    with Isaac Rodriguez.

17    Q.    So consistent with Isaac Rodriguez placing an order for

18    someone else to pick up on his behalf?

19    A.    Yes.

11:10AM   20    Q.    And, again, is that allowed?

21    A.    No.

22    Q.    Okay.  In order to pick up those weapons, would

23    Mario Reyna have had to say he was picking them up on his

24    behalf for him as the owner?

11:10AM   25    A.    Yes.

Q.    All right.  Just a couple of more questions,

Agent Settelen.

    You mentioned that this defendant is the sole owner of

Zeroed in Armory; is that correct?

11:10AM   A.    Yes.

Q.    And you also mentioned that in 2019 alone, Zeroed in

Armory collected over $750,000 in (Technical interference.)

alone; is that right?

A.    Yes.  There's some hard feedback so I'm having trouble

11:11AM   hearing you; but, yes, I think so.

Q.    Let's be clear.  In 2019 alone, were there over $750,000

in cash deposits that would go back directly to this defendant?

A.    Yes.  We had grand jury subpoenas of his bank records and

there are -- the main account for Zeroed in Armory was like --

11:11AM   it was like $1.75 million deposited into that one account over

the course of 2019.

Q.    All right.  In the course of your investigation, were you

able to determine -- well, I guess let me back up.

    Would it be fair to say there is a concern about his ties

11:12AM   to Mexico given where these firearms are ending up?

    MR. AKERS:  Objection (Inaudible.)

    THE COURT REPORTER:  This is the court reporter.  Could

you repeat your objection?

    MR. AKERS:  Calls for speculation.

11:12AM   THE COURT:  Overruled.

**BY MS. COLLINS:**

Q.    All right.  And let me know if you can't hear me, Agent Settelen.

A.    Okay.

Q.    Due to where firearms continually purchased at Zeroed in Armory end up, in Mexico, is there a concern about this defendant's ties to Mexico?

A.    Yeah, I mean, he could have ties to Mexico through these other individuals.

Q.    Were you also able to discover in the course of your investigation that he still has an affiliation out of country, specifically with Saudi Arabia?

A.    Yes, his father lives in Saudi Arabia per information he told me in the interview.  And he has an active passport.  It was renewed based on information found in his bank records last year, and he told me he traveled out of the country in May of last year at some time frame.

       And one other thing about -- these firearms associated to Rodriguez, some of these .50 caliber rifles that were recovered and associated with Isaac Rodriguez, Javier Cavazos, Israel Chapa and others, those firearms were recovered in conjunction with a massacre that took place in Mexico.

       This massacre that took place was in the town of Villa Union, Mexico; and there were approximately 50 individuals suited with vehicles in military fatigues.  The

1    vehicles were marked with "CDN," which is Cártel del Noreste.

2        And they attacked the police station there in Villa Union

3    and four Mexican State police officers were murdered during

4    that massacre as well as 15 other people were killed with

11:14AM  5    firearms that directly come back to Israel Chapa and others

6    associated to this firearms trafficking ring.

7    Q.    Let me be clear.  Were those firearms purchased at Zeroed

8    in Armory?

9    A.    Yes.

11:15AM  10   Q.    And I think I failed to mention that along with that, the

11   firearms that were recovered in Mexico purchased by Nathaniel

12   Clair at Zeroed In, were those found in a high-level cartel

13   member's home or building?

14   A.    Yes, there were.

11:15AM  15   Q.    And when you spoke to the defendant postarrest, did he

16   seem to have any remorse for the sales that he had made?

17   A.    It did not appear to me that he had any remorse and

18   attempted to try and justify his purchases, stating that

19   there's no real rule that says that he can't sell 105 firearms

11:15AM  20   or large numbers of firearms to individuals, which he's correct

21   there's not a rule that states that.

22        But there are a lot of indicators that he had knowledge

23   these firearms were going to Mexico and close contact with the

24   individuals that were taking them there.

11:16AM  25        MS. COLLINS:  Your Honor, with that, I would pass the

1    witness.

2         THE COURT:  All right.  So, Mr. Akers, let me give you

3    a few minutes to talk with your client before you begin cross

4    if that's what you want to do.

11:16AM  5         MR. AKERS:  Yes, ma'am.

6         THE COURT:  All right.  How is that going to happen?  I

7    guess you're just going to call the client, correct; or he's

8    going to call you?

9         MR. AKERS:  I have the number to call.

11:16AM 10         THE COURT:  All right.  So everyone kind of mute your

11   mikes and stand by.

12         MS. COLLINS:  Your Honor, while we have a moment, may I

13   be excused for just a second?

14         THE COURT:  Yes, of course.  We're going to take a few

11:16AM 15   minutes.  Yeah.

16                   (Court is in recess.)

17         THE COURT:  Go ahead, Mr. Akers.

18                   **CROSS-EXAMINATION**

19   **BY MR. AKERS:**

11:30AM 20   Q.    Agent Settelen, when did you come on to this case, sir?

21   A.    I officially -- well, yeah, I began investigating, I

22   think, in December; and the investigation kind of took off more

23   so in, I think, I believe, February of this year.

24   Q.    And Mr. Abdulaziz is charged by way of a complaint with

11:31AM 25   selling a firearm to a prohibited person under 922(b)(5); is

1   that correct?

2   A.   Say that again.  You broke up a little bit.  922 what?

3   Q.   (b)(5); is that correct?

4   A.   922(b)(5) is failing to note the name, age, and place of

11:31AM 5   residence of an individual when an FFL sells a firearm.

6   Q.   That's my mistake.  It's (d)(1), right?  Selling a firearm

7   to a felon.

8   A.   Yes.

9   Q.   He is not charged with shipping firearms to Mexico,

11:31AM 10  correct?

11  A.   Not at this time.

12  Q.   Because that is a case you are trying to build, correct?

13  A.   Not necessarily.  It's because grand jury closed and we

14  can't go to an indictment.

11:31AM 15  Q.   Well, you can still file a complaint, correct, just like

16  you did here, correct?

17  A.   The complaint had four charges listed in it.

18  Q.   I understand.  But the long and short of it is you do not

19  have a witness or someone who will concretely tell you

11:32AM 20  Khalid Abdulaziz was in on this scheme and knew where these

21  weapons were going, correct?

22  A.   At this time, yeah.

23  Q.   You do not have a witness who will concretely tell you at

24  this time that Khalid Abdulaziz knew that Isaac Rodriguez was

11:32AM 25  the actual purchaser of these weapons, correct?

1    A.    Yeah, I guess that's technically correct.

2    Q.    You've spoken to a lot of these purchasers, right?

3    A.    Yes.  And Mr. Abdulaziz stated that Mr. Rodriguez would

4    send him people to buy firearms.

11:32AM  5    Q.    Right.  That he was a referral source, correct?

6    A.    Yes.  That's how he put it.

7    Q.    And that's not illegal, referring people to a business?

8    Is that true?

9    A.    Yeah, there's nothing wrong with that or there's no laws

11:33AM  10   against it.

11   Q.    Are you aware that his Zeroed In Armory is a business that

12   is by and large part referral-based?  They don't advertise.

13   They have a website, but it's a referral-based business?

14   A.    Yeah.  Well, sending people to a business to get a

11:33AM  15   kickback for them purchasing firearms from that individual, I

16   would have to check on the legality of that.  I don't know off

17   the top of my head.

18   Q.    A finder's fee is not illegal, correct, for finding

19   customers?

11:33AM  20   A.    That's not illegal, I don't believe.

21   Q.    And Mr. Abdulaziz is held to FFL, correct; so he legally

22   sells firearms to his customers?

23   A.    Yes.

24   Q.    And to get an FFL, you have to go through a very extensive

11:33AM  25   background check?

1    A.    You have to go through a background check process with

2    ATF, yes.

3    Q.    And ATF is the exact same agency who has been

4    investigating this matter; is that right?

11:34AM  5    A.    Yes.

6    Q.    And you began investigating not only Zeroed in Armory, but

7    also Khalid Abdulaziz as a person; is that right?

8    A.    Yeah, because he's the sole LLC, managing member on the

9    LLC.  Him and the business are one and the same.  The

11:34AM  10   investigation into the business and --

11   Q.    That's what I wanted. (Inaudible.)

12         THE COURT REPORTER:  I'm sorry.  I'm going to have to

13   ask you to repeat your question.

14   **BY MR. AKERS:**

11:34AM  15   Q.    You know a lot about him?

16   A.    Yeah.

17   Q.    You know that there is no evidence or rather you have no

18   evidence whatsoever that he abuses alcohol or drugs?

19   A.    No, I don't.

11:34AM  20   Q.    You have no evidence that he has a violent bone in his

21   body?

22   A.    Well, hold on.  Go back to the last question.

23         There was an interview that took place that suggested that

24   Isaac Rodriguez or associates could possibly be selling

11:35AM  25   narcotics to Abdulaziz, but it was never confirmed.

Q.    And that would be something that you would want to
confirm, correct?

A.    Yeah, we will if it's possible through the investigation.

Q.    And it may not be possible because it may not be true,
correct?

A.    That's true.

Q.    And you also found -- I want to go back and make sure
we're clear on this one.  You have no evidence whatsoever that
he himself has any proclivity for violence at all?

A.    No.

Q.    You know that he has absolutely no criminal record of any
type whatsoever?

A.    That's correct.

Q.    And you mentioned in your direct examination that he could
have ties to Mexico through these other individuals, right?

A.    Yes.

Q.    That is exactly what it sounds like -- a possibility, but
you have nothing to back it up, correct?

A.    Yeah, I don't have any direct information that he has
associates in Mexico.

Q.    And, likewise, you mentioned that he has an active
passport, right?

A.    Yes.

Q.    It was renewed last year.  Do you know why?

A.    Abdulaziz told me that he went on a honeymoon to Italy.

1  Q.   With his new wife, Mina Amiry, right, the Houston

2  attorney?

3  A.   That's correct.

4  Q.   And would it be fair to say through your investigation

11:36AM  5  that that is the only trip out of the country you know of that

6  he has made since he started living in Houston in 2006?

7  A.   I believe so.  I thought he told me that he visited his

8  father at some point, but I'm not a hundred percent on that.

9  He might have said his father came here.

11:37AM  10  Q.   He does not have close contact with his father.  Is that

11  true?

12  A.   I can't speak to that.  I have no idea.

13  Q.   Well, you've spoken with him, correct; and one of the

14  things the prosecutor is concerned about is his ties to

11:37AM  15  Saudi Arabia?

16  A.   Yeah, but Abdulaziz didn't tell me how close his

17  relationship was with his father so I prefer not to answer.

18  Q.   Would it surprise you to learn that Mr. Abdulaziz didn't

19  even invite his father to their wedding, that his wife had to?

11:37AM  20  A.   Yeah, I mean, I guess it's not surprising.  I don't know.

21  Yeah.  Fine.

22  Q.   And you can't name anyone else in Saudi Arabia that he

23  would have a connection with whatsoever, right?

24  A.   He told me he was born there.  I don't know of anybody

11:37AM  25  else that he may know, but it's possible that he has contacts

1   there since he's affiliated with it and he was born there.

2   Q.   And, again, it's possible.  It's just that it's a

3   possibility, right?

4   A.   Yes.

11:38AM  5   Q.   Would it surprise you to learn that his Saudi Arabian

6   passport has been expired for at least a decade?

7   A.   I didn't have any knowledge of that.

8   Q.   That he looks kind of like a 12-year-old in this

9   Saudi Arabian passport picture?

11:38AM 10   A.   I can't see it.  It's too close.

11   Q.   That's the danger of a Zoom hearing I suppose.

12        But in any case, other than a father that he does not

13   speak to, you have no idea of what connections he may have

14   there and it's quite possible the answer may be none?

11:38AM 15   A.   Yes.

16   Q.   So in addition to the investigation here, the ATF also

17   does -- is it a yearly audit of FFLs?

18   A.   It doesn't necessarily have to be every year.  It's based

19   on a cycle, yes.  I believe he was inspected in 2018.

11:39AM 20   Q.   How long do those audits typically last?

21   A.   It depends on how many violations are found, but it could

22   be hours.  It could be days.  It just depends.

23   Q.   And in any of those audits that you conducted into Zeroed

24   in Armory, were there any violations found?

11:39AM 25   A.   Yes.  There were record-keeping things and such like that

1    that weren't done correctly.  I also found -- since I've gotten

2    his records, I found several things that would constitute

3    violations that would give --

4    Q.    I'm talking about these audits in 2018 and the years

5    before.  But nothing that would cause him to lose his FFL,

6    correct?

7    A.    You know, so here is the thing.  The inspections that

8    takes place of FFLs are another branch, so to speak, of ATF.

9    Those are the industry operations investigators.  They are

10   not --

11   Q.    It's not you?

12   A.    -- they are not criminal investigators.  And I don't feel

13   comfortable speaking to all of his previous inspections at this

14   time because I haven't had a chance to review all of those

15   inspections, but I know that there were things that if brought

16   up, could possibly go down that road, yeah.

17   Q.    Let me be clear and more concise.  He was inspected

18   several times, audited several times; and each time was granted

19   a new license?

20   A.    Yes.

21   Q.    Would it surprise you to learn that some of those

22   inspections that you said could take hours at Zeroed in Armory,

23   ATF spent months there?

24   A.    Yeah.  I mean, it just depends, like I said, on the actual

25   inspection of how long it takes and how many violations as well

1    as how many guns are there that they have to look at.

2    Q.    And before I forget, were there any reports or audio

3    recordings or notes that you've taken that you relied on for

4    your testimony today?

11:41AM  5    A.    Notes -- I haven't taken any notes.  I'm relying mostly on

6    memory and on my affidavit for the search warrant.

7    Q.    You have not listened to the recordings of these

8    confidential informants?

9    A.    I'm sorry.  I couldn't understand the question.

11:41AM  10    Q.    Have you listened to the recordings of these confidential

11    informants?

12    A.    Oh, yes, I have.

13    Q.    Have you written any reports recording those recordings?

14    A.    Some of them, yes.

11:42AM  15        MR. AKERS:  Your Honor, I believe I'm entitled to

16    those.

17        MS. COLLINS:  He should have received those this

18    morning prior to the hearing.

19        MR. AKERS:  I haven't received anything.

11:42AM  20        MS. COLLINS:  Mr. Akers, could you just confirm your

21    e-mail to make sure.

22        MR. AKERS:  It's cca@akersfirm.com.

23        THE COURT:  We're still getting feedback from somebody.

24        MR. WILHITE:  It's probably whoever doesn't hear it.

11:43AM  25        THE COURT:  So, Mr. Akers, you're seeking recordings

1    that the witness listened to?

2         MR. AKERS:  And any reports he's written regarding the

3    facts that he's testified to.

4         MS. COLLINS:  I'm resending that now, Your Honor.  It's

11:43AM  5    just taking a little bit of time for it to upload.

6         THE WITNESS:  You got the reports, right, Lisa?

7         MS. COLLINS:  Yes.

8              (Brief pause in the proceedings.)

9         MS. COLLINS:  It's showing sent.

11:45AM  10         MR. AKERS:  I'll continue and then if it's substantial,

11    Your Honor, could I ask for a short break to review it?

12         THE COURT:  Yes.

13         MR. AKERS:  Thank you, Your Honor.

14    **BY MR. AKERS:**

11:45AM  15    Q.   You mentioned, Special Agent, several individuals that

16    purchased firearms from Zeroed in Armory.  That's Mr. Levias,

17    right?

18    A.   Levias, yes.

19    Q.   Levias.  Mr. Lara?

11:45AM  20    A.   Yes.

21    Q.   Mr. Clair?

22    A.   Yes.

23    Q.   Mr. Chapa?

24    A.   Yes.

11:45AM  25    Q.   Mr. Baranowski and Ms. Giddens?

A.    Yes.

Q.    You would agree with me?

A.    And Cavazos.

Q.    And Cavazos.  You would agree with me that every single transaction that you were aware of with those individuals, an ATF Form 4473 was filled out?

A.    Yes.

Q.    And even with Mr. Clair, your office requested information from Mr. Abdulaziz on a suspicious transaction and he specifically communicated with you and sent you everything he had?

A.    I mean, if the case agent contacted him, I wasn't aware of that.

Q.    Well, the case agent contacted him and requested some documents; and he sent them.  That was your testimony on direct; is that correct?

A.    No.  I stated in my testimony that a lot of the documents received on Clair were submitted through the multiple sale reports, which is a first look report that ATF gets that would have been submitted by Zeroed in Armory with a list of firearms that somebody purchased pistols in a five-day period.

Q.    Let me ask a broader question.

      Has there ever been a point when you tried to contact Mr. Abdulaziz in relation to this case or an audit or anything when he did not answer all of your questions?

A.    He answered the questions, and he sent the documents over
when asked.

Q.    And --

A.    He's required to.

11:47AM    Q.    Right.  And you've investigated several of these cases,
right?

A.    Several firearms trafficking cases, yes.

Q.    And if someone were to learn that they are under
investigation or learn there is an investigation ongoing
11:47AM    involving them, if they're going to flee, that's the right
time, isn't there?

        MS. COLLINS:  Objection to speculation.

        THE COURT:  Sustained.

**BY MR. AKERS:**

11:48AM    Q.    So when you interviewed Mr. Abdulaziz, you discussed
Isaac Rodriguez liked we talked about, correct?

A.    Yes.

Q.    And you learned that Mr. Abdulaziz told you that
Mr. Rodriguez was referring clients over, referring people and
11:48AM    collectors and things like that?

A.    Never used the term "collector," but he mentioned people
buying guns to keep as an investment.

Q.    And that's legal, is it not?

A.    To keep guns as an investment, that's fine.

11:48AM    Q.    And would you agree with me that during election years

1    people decide to start buying up guns quite a bit more if they

2    think that the Second Amendment might be trampled a bit?

3    A.    Yeah, people tend to buy more guns close to elections and,

4    you know, other natural disasters and things.

11:49AM  5    Q.    And with Mr. Rodriguez, sending someone to Zeroed In

6    Armory to purchase firearms, they purchased the firearms, all

7    the forms are filled out correctly and legally and then they

8    leave.  That was the end of Mr. Abdulaziz's involvement,

9    correct?

11:49AM  10   A.    That's yet to be determined, but there's evidence that he,

11   you know --

12   Q.    As far as -- let me -- you have absolutely nothing, no

13   concrete evidence to suggest that Mr. Abdulaziz knew that these

14   firearms were going directly back to Mr. Rodriguez?  No one has

11:49AM  15   told you that, correct?

16   A.    Other than the video where Mr. Abdulaziz is in there

17   asking him if the money was ready.

18   Q.    And that money could have been from anyone, correct?

19   A.    Could have been.

11:50AM  20   Q.    So let's talk about these confidential informants that's

21   the subject of the case charge.

22        You have these suspicions so you sent in these CIs, right?

23   A.    Yes.

24   Q.    And the purchase was to see if Mr. Abdulaziz had the

11:50AM  25   disposition to sell to a felon, correct?

1    A.    Yes.

2    Q.    And you said the CIs -- CI Number 1 tried to buy a gun,

3    correct?

4    A.    Yes.

11:50AM  5    Q.    And Mr. Abdulaziz asked for his ID like he's required to

6    do, right?

7    A.    Yes.

8    Q.    And he said, "I'm a felon.  I'm not going to pass a

9    background check," right?

11:50AM  10   A.    Yes.

11   Q.    And Mr. Abdulaziz says, "Well, I can't sell to you,"

12   correct?

13   A.    No.

14   Q.    He was not predisposed to immediately sell the firearm

11:50AM  15   right to CI Number 1, correct?

16   A.    No.  He said legally I have to do a background check and

17   suggested that he run it on CI-2.

18   Q.    And CI-2 said, "Yes, I want to purchase the firearms,"

19   right?

11:51AM  20   A.    Yes.

21   Q.    And it's not illegal if -- and CI-2 and CI-1, have they

22   told him that they were in the same household?

23   A.    Yes.

24   Q.    It's not illegal for CI-2 to possess the firearm even if

11:51AM  25   CI-1 is in the house, correct?

A.    No, that's not illegal.

Q.    You then -- and so after -- I think you write in your

complaint that CI-2 purchases the firearms.  After that occurs,

you wait three weeks to send CI-1 back over there, correct,

11:51AM   from March 27th to April 16th?

A.    Yes.

Q.    And did CI-1 reintroduce himself at that point?

A.    Yes.  Well, no.  Yeah, Abdulaziz already knew who he was.

Q.    Did he say, "Remember I'm a felon"?

11:52AM   A.    He had mentioned on the phone that he couldn't buy pistols

because CI Number 2 wasn't at least 21.  And then, you know, he

knew who he was when he entered, "Hey, this is -- he said, "You

were picking up these guns, right?"

Q.    Right.  And he -- one of them is a private party sale,

11:52AM   right?

A.    There's no such thing as a private party sale.  A firearm

is on consignment.

Q.    Okay.  But there are certain situations, would you agree

with me -- and the *Code of Federal Regulations* for firearm sale

11:52AM   is incredibly large, right?

A.    Yes.

Q.    There are certain situations where one individual can sell

a firearm to another without any background check, correct?

A.    A private citizen can sell to another private citizen; but

11:53AM   as soon as the private citizen asks an FFL to sell a firearm on

1    their behalf, then the FFL is required to complete a background

2    check and a 4473.

3    Q.   Right.  I understand.  It may not be this one, but you

4    would agree with me nobody knows verbatim every single *Code of*

11:53AM  5    *Federal Regulations* for firearm distributions, right?

6    A.   I believe there's probably people that know every single

7    regulation.

8    Q.   And you mentioned that CI-1 had a conversation in Spanish,

9    right?

11:53AM  10    A.   Yes.

11    Q.   Do you know that Mr. Abdulaziz does not speak Spanish?

12    A.   Yes.

13    Q.   And he said that he was -- his boss wanted to take him to

14    Mexico, right -- take the guns to Mexico?  Excuse me.

11:53AM  15    A.   Yes.

16    Q.   And Mr. Abdulaziz specifically warned him "You can't do

17    that," right?

18    A.   And stated that he shouldn't be selling to him if he's

19    telling him that.

11:54AM  20    Q.   He said that specifically more than once.  "If you guys

21    are planning to take them to Mexico, I can't sell you guns if

22    you're doing that," right?

23    A.   He stated that at least once.

24    Q.   In the complaint it says it at least twice.  He very

11:54AM  25    specifically said, "If you're telling me you're taking them to

1    Mexico, I cannot sell you weapons."

2    A.    Yeah.  However, he still sold him the weapons.

3    Q.    How many times in the complaint does Mr. Abdulaziz

4    specifically tell him, "I can't sell you guns if you're doing

11:54AM   5    this" and tell them what the law is?

6    A.    Can I have a moment to pull up the complaint?

7    Q.    Well, given that we're on video conference, if I told you

8    the answer was seven, would you believe me?

9    A.    He told him seven times what?

11:55AM   10    Q.    Seven different times that I can't sell you guns if you're

11    doing X, Y or Z?

12    A.    Okay.

13    Q.    So, after that --

14    A.    It appeared to me that Mr. Abdulaziz was making those

11:55AM   15    statements to try and cover himself because he knew what they

16    were doing was illegal and he shouldn't be selling them

17    firearms.

18    Q.    What appears to you is not the standard, right?  It's what

19    Mr. Abdulaziz did, correct?

11:55AM   20    A.    Well, he knew the laws because during the inspections that

21    you referenced earlier, I have signed reports where

22    Mr. Abdulaziz had every single law that he's required to

23    follow, he checked the box and then he had the opportunity for

24    the inspectors to explain that law to him and what his

11:55AM   25    responsibilities were as a Federal Firearms Licensee to which

1   he signed multiple forms over the course of several years that

2   said that he knew the rules and could follow them.

3   Q.    And you mentioned several times -- or maybe not several

4   times.  I'm sorry.  That's disingenuous -- about the amount of

11:56AM   5   money that went through the store, right?

6   A.    Yes.

7   Q.    And you got grand jury subpoenas for the bank records,

8   correct?

9   A.    I did.

11:56AM   10   Q.    How much money --

11   A.    Some of that is still being analyzed.

12   Q.    How much money is in the account?

13   A.     It depends.  There's multiple accounts.  It's pretty

14   convoluted, all of the transfers and everything; and it's still

11:56AM   15   being analyzed by financial investigators.

16   Q.    As far as what's in the account right now, would it

17   surprise you to learn it's, like, $30,000?

18   A.    It doesn't surprise me because money was being moved

19   somewhere and that's what they're trying to figure out where

11:56AM   20   the money went because in December of 2019, Mr. Abdulaziz

21   deposited $357,000 into his bank account; but by January 1

22   account opening in 2020, there was only $10,000 in that

23   account.

24       So we're not real sure where $340,000 went, and that's why

11:57AM   25   they're still investigating.

1   Q.   Would it surprise you to learn that when he sells weapons,

2   he only does so at about a 5 to 10 percent markup?

3   A.   That's what he said, but that's inaccurate based on the

4   financial records.  I think last year it was closer to 17 to

11:57AM   5   18 percent markup based on his taxes and things like that that

6   they've looked at already.

7   Q.   In the Zeroed in Armory, the entire business is not sale

8   of firearms, correct?

9   A.   No.  He has several machines.

11:57AM   10   Q.   A large part of it is, like, engravings and doing

11   aesthetic stuff on weapons?

12   A.   He has the capability to do that.  I don't know how much

13   money he's taken in from that specifically.

14   Q.   Okay.  So you execute a search warrant on the store,

11:58AM   15   correct?

16   A.   Yes.

17   Q.   Did you seize all the firearms?

18   A.   I believe so.  I was -- ATF did execute it.  We seized a

19   large number of firearms.  If there were any missed, I don't

11:58AM   20   believe so; but, yeah, I think we did.

21   Q.   Fair to say you're not going to miss a gun somewhere.  You

22   probably got them all, correct?

23   A.   I hope so.

24   Q.   So --

11:58AM   25   A.   There were a lot of little areas in there.  So yeah.

Q.    Okay.

A.    We tried to seize every firearm that was at the store.

Q.    And when the search warrant was being executed and
Mr. Abdulaziz was arrested, his wife showed up, correct?

11:58AM
A.    I believe so, yeah.

Q.    Did you have a chance to meet her?

A.    I did not.

Q.    Did you know that she is an attorney in Houston with
Hill & Hill law firm, an eminent domain firm?

11:59AM
A.    Abdulaziz told me that.

Q.    Do you know that they met in law school and own a modest
home together out in Pearland?

A.    Yes.

Q.    And you know this financial talk, you know they're not,
11:59AM
like, living large, right?  It's a pretty modest home.

A.    I've seen his residence, yes.

Q.    And from your impression, I would gather, he cares quite a
bit about his wife?

A.    I couldn't speak to that.

11:59AM
Q.    Well, from your impression, would you say that she cares
quite a bit about him?

      MS. COLLINS:  Object to speculation, Your Honor.

      THE COURT:  I'll allow it if you know.

A.    Yeah, I mean, she called or whenever she was talking to
11:59AM
him on the phone while -- after he was arrested, she, I guess,

1    seemed like a concerned wife.

2    BY MR. AKERS:

3    Q.    And you met her so you know that she's about

4    eight-and-a-half-months pregnant, correct?

5    A.    I didn't meet her, but Abdulaziz told me that she's

6    pregnant and due in June.

7    Q.    In about five or six weeks, they will have their

8    first-born son?

9    A.    Yes, if it's a boy.  Yeah, he told me that it was a boy.

10   Q.    Are you a father, sir?

11   A.    I would rather not get into my personal life.

12   Q.    Yeah, I understand.

13         But can you imagine a different event in a young man's

14   life that will more firmly keep him rooted on the ground with

15   his family than the birth of a first-born son?

16         MS. COLLINS:  Your Honor, I'm going to object to

17   speculation.

18         THE WITNESS:  Yeah.

19         THE COURT:  I'll sustain that.

20         MR. AKERS:  That's all I have, Your Honor.

21         THE COURT:  Ms. Collins, anything else?

22         MS. COLLINS:  Very, very briefly, Your Honor.

23                        REDIRECT EXAMINATION

24   BY MS. COLLINS:

25   Q.    Agent Settelen, defense counsel mentioned this idea of a

1    referral fee.  When you picked up the defendant and questioned

2    him about the over a hundred guns that were delivered to

3    Zeroed In on the day of the warrant, did he tell you who those

4    guns were for?

12:01PM   5    A.    Yeah, he said they were ordered by Isaac Rodriguez.

6    Q.    And who did he say was going to pick them up?

7    A.    Reyna.  An individual named Reyna.

8    Q.    And if Reyna was there, would he be the one who would have

9    to fill out a 4473?

12:01PM   10    A.    Yes.

11    Q.    Despite the fact they were for Rodriguez?

12    A.    Yes.

13    Q.    Similarly when you spoke to Baranowski, Steven Baranowski,

14    was he clear that it was Isaac Rodriguez and not himself that

12:01PM   15    placed the orders?

16    A.    Yes.

17    Q.    Similarly did he fill out a 4473?

18    A.    Yes.

19    Q.    Did he lie on that 4473 and state that he was picking them

12:01PM   20    up for himself?

21    A.    Yes.

22    Q.    And is that why he's also been charged?

23    A.    Yes.

24    Q.    Nevertheless was he honest about the fact that he

12:02PM   25    purchased those for Rodriguez to take to Mexico?

1    A.    Yes.

2    Q.    Similarly when Ashley Giddens was spoke to, was she clear

3    that she was picking up items that were not for her, but were

4    for an Israel Chapa?

12:02PM  5    A.    Yes.

6    Q.    Again, she filled out those 4473s, right?

7    A.    Yes.

8    Q.    Nevertheless it was clear to her that someone else had

9    placed the order since she had not?

12:02PM 10    A.    Yes.

11    Q.    And in all of these situations, it was clear that the

12    defendant was expecting the individual who picked up the

13    firearms, correct?

14    A.    Yes.

12:02PM 15    Q.    Even though they had placed no order?

16    A.    Yes.

17    Q.    And defense counsel asked you about whether or not the

18    felon CI had been re-asked about his felony status the second

19    time.  Who were the forms filled out for on the second

12:03PM 20    encounter?  For the felon or for his girlfriend?

21    A.    I'm sorry.  Can you restate that?

22    Q.    Yes.  Absolutely.

23          The second time when the felon CI went into Zeroed In,

24    were the forms for those weapons, the ones that were filled out

12:03PM 25    anyway, filled out in his name or her name?

1    A.    One of the firearms was in her name and the other firearm

2    was sold to him with no paperwork whatsoever and that firearm

3    was sold directly to him.

4    Q.    And when the 4473 was filled out in her name that second

12:03PM  5    time, was she even in the building?

6    A.    She came into the building to fill out the form, but the

7    CI-1 was the one that requested the firearm and that's when

8    Mr. Abdulaziz said, "Is CI-2 here?"

9          And she was retrieved from the vehicle to fill out the

12:04PM  10    forms.

11    Q.    Did that tell you that he recalled the fact that CI-1 was

12    a felon?

13    A.    Yes.  Because he would have known that CI-1 couldn't fill

14    out the forms.

12:04PM  15          MR. AKERS:  Your Honor, I'm going to object to

16    speculation, Your Honor.

17          THE COURT:  Say that again.

18          THE WITNESS:  It's not speculation.  If he wants the

19    guns, why would he not fill out the form.

12:04PM  20          MS. COLLINS:  Why don't I re-ask the question,

21    Your Honor?  That might take us back a little bit.

22          THE COURT:  Go ahead.

23    BY MS. COLLINS:

24    Q.    Agent Settelen, did the encounter the second time happen

12:04PM  25    just the way it had happened the first time?  In other words,

1    was the felon the one that handed over the money?

2    A.    Yes.

3    Q.    Was the felon the one that took the item from the store?

4    A.    Yes.

12:05PM 5    Q.    And yet the defendant had the second CI fill out the

6    paperwork; is that right?

7    A.    Yes.  And to be fair -- go ahead.

8    Q.    You mentioned consignment sales.

9    A.    Yes.

12:05PM 10   Q.    Is an FFL allowed to do what you call a consignment; in

11   other words, buying something from a private citizen?

12   A.    An FFL is allowed to put firearms on consignment for other

13   individuals.  During the undercover contact, Mr. Abdulaziz

14   stated that the firearm was not his, that it belonged to one of

12:05PM 15   his customers and he was selling it for him; therefore, that

16   firearm is on consignment.

17          Furthermore in the interview with Mr. Abdulaziz, he stated

18   that how he would do private sales versus consignment would be

19   he would mark the firearm as not for sale and place it in his

12:06PM 20   personal inventory of firearms even though that firearm was not

21   his personal firearm.  It would belong to somebody else.

22          And this is a way to conceal the fact that that firearm

23   has not entered into the A&D book.

24   Q.    Okay.  Let me stop you right there.

12:06PM 25          To be clear, when a gun is on consignment by an FFL, are

1  they still required to fill out the appropriate paperwork and

2  run the appropriate background checks to sell that weapon?

3  A.    Yes.

4  Q.    And was that done?

12:06PM  5  A.    That was not done on that firearm.  During the undercover

6  meeting, the CI -- while the CI was there, another customer

7  came into the store who happened to be a police officer to drop

8  off a firearm for consignment.

9       After that police officer left, Mr. Abdulaziz stated that

12:06PM  10  there was another firearm on the wall that was -- that that

11  police officer was selling.  It was considered a pistol because

12  it had an arm brace on it and therefore could not be purchased

13  by CI Number 2 because CI Number 2 is not 21 years of age.

14      At this time Mr. Abdulaziz said he wants all of the

12:07PM  15  paperwork to be done correctly on that one.  So it indicated

16  that he knew the difference between a firearm on consignment

17  and a firearm that he was selling for somebody and placing it,

18  you know, not doing the correct paperwork for it.

19           MS. COLLINS:  All right.  Nothing further, Your Honor.

12:07PM  20           THE COURT:  Mr. Akers, anything else?

21           MR. AKERS:  Very briefly, Judge.

22                        **CROSS-EXAMINATION**

23  BY MR. AKERS:

24  Q.    Agent Settelen, you have no concrete evidence to suggest

12:07PM  25  that Mr. Abdulaziz plans to harm anyone if he is released,

1    correct?

2    A.   No.

3    Q.   You have no concrete evidence to suggest that he plans to

4    flee if he is released, correct?

12:08PM   5    A.   No.

6              MR. AKERS:  Pass the witness, Your Honor.

7              MS. COLLINS:  Nothing further, Your Honor.

8                        (End of Excerpt.)

9                          *  *  *  *

10                    REPORTER'S CERTIFICATE

11             I, Lanie M. Smith, CSR, RMR, CRR, Official
     Court Reporter, United States District Court, Southern District
12   of Texas, do hereby certify that the foregoing is a true and
     correct transcript, to the best of my ability and
13   understanding, from the record of the proceedings in the
     above-entitled and numbered matter.

14

15                        ____/s/ Lanie M. Smith_____
                          Official Court Reporter
16

17

18

19

20

21

22

23

24

25