1          IN THE UNITED STATES DISTRICT COURT

2              SOUTHERN DISTRICT OF TEXAS

3                       – – –

4        THE HONORABLE GREGG COSTA, JUDGE PRESIDING

UNITED STATES OF AMERICA, )

5                          )

       Plaintiff,          )

6  v.                      )     NO. 4:20-CR-00026

                           )

7  KHALID ABDULAZIZ,       )

                           )

8        Defendant.        )

9                      **SENTENCING**

       OFFICIAL REPORTER'S TRANSCRIPT OF PROCEEDINGS

10                      Houston, Texas

                       July 20, 2022

11

APPEARANCES:

12

For the Plaintiff:    Jennifer Stabe, Esq.

13                     Lisa Collins, Esq.

14 For the Defendant:    Cordt Akers, Esq.

                       Derek Hollingsworth, Esq.

15

16 Reported by:  Mary Nancy Capetillo, CSR, RPR, TRR

               Official Court Reporter

17             United States District Court

               Southern District of Texas

18             mary_capetillo@txs.uscourts.gov

19     Proceedings reported by computerized stenotype

20 machine.

21

22

23

24

25

```
 1                        PROCEEDINGS
 2                 THE COURT:  All right.  Good morning,
 3     everyone.  We're here for sentencing in case 20-26,
 4     United States versus Khalid Abdulaziz.  Who's here for
 5     the Government?
 6                 MS. STABE:  Jennifer Stabe for the
 7     Government.
 8                 THE COURT:  And for the Defendant?
 9                 MR. HOLLINGSWORTH:  Derek Hollingsworth
10     and Cordt Akers for Mr. Abdulaziz.
11                 THE COURT:  Everyone come forward.  Good
12     morning, Mr. Abdulaziz.
13                 THE DEFENDANT:  Good morning.
14                 THE COURT:  Come up to the front here.
15     Well, I know this is -- it's a difficult day for you.
16                 THE DEFENDANT:  Yes, sir.
17                 THE COURT:  As you know, you're here to be
18     sentenced after you pled guilty to six counts of aiding
19     and abetting the making of false statements on ATF
20     forms.  Each of those counts you can be sentenced up to
21     five years in prison.  To help me figure out what your
22     sentence should be, I'm supposed to consider the
23     sentencing guidelines.  Those were calculated in this
24     presentence report.  It's 53 pages.  Did you go over
25     this report with your lawyers?
```

```
1                    THE DEFENDANT:  Yes, Your Honor.
2                    THE COURT:  They filed a number of
3   objections, which I'm going to talk about in just a
4   minute.  What I want to know now is whether -- we're
5   going to talk about the objections they did file; but
6   other than those objections, is there anything else in
7   here that you thought was false that needs to be
8   corrected this morning?
9                    THE DEFENDANT:  No, Your Honor.
10                   THE COURT:  Okay.  So what we're going to
11  do this morning, first I'm going to discuss those and
12  rule on those objections.  Then once I've resolved the
13  objections and decided what the guideline range will
14  be -- you'll remember when you pled guilty I said that I
15  have to consider that guideline range, but I don't have
16  to follow it.  I can go above or below if I think
17  there's good reason to do so.  And at the end of the
18  day, while I have to consider the guidelines, what I
19  have to do is give you a sentence that is sufficient but
20  not more than necessary to accomplish the goals of
21  sentencing, taking into account all the facts of this
22  case, all your personal history, you know, basically how
23  you've lived your life and then considering things like
24  your history but also the seriousness of the offense,
25  the nature of this crime and a number of other factors
```

1    that your attorneys have addressed.

2                This is -- this may be the thickest file

3    I've had for a sentencing.  That's a good thing.  The

4    more information, the better -- you know, the better

5    decision I can hopefully make.

6                So the Government wishes to go through

7    what some of those documents are.  We're going to talk

8    about your lawyers' objections.  The Government filed

9    one objection saying that it's incorrect in paragraph 61

10   when it said you burned cardboard boxes, and they've

11   made that objection in other cases.  So that's been

12   cleared up.

13               Then your lawyers filed the objections

14   that we're going to talk about.  Then your lawyers also

15   filed this memoranda in aid of sentencing, which has a

16   number of letters I read yesterday from family, friends,

17   a lot of people who care a lot about you.  Then

18   probation responded to the objections.  The Government

19   filed a lengthy response.  It has a lot of exhibits

20   attached -- that's why it's lengthy -- to the

21   objections.

22               So let's first talk about those

23   objections.  And then once I rule on the objections and

24   decide what your guideline range is, to help me figure

25   out what your sentence should be, I'll first hear the

1    Government's position.  Then your lawyers will have a
2    chance to tell me -- I mean, they've already filed, like
3    I said, a lengthy memo; but they'll also have a chance
4    in court today to tell me what they think I should do.
5    And then after you've heard what everyone else says,
6    you'll get the last word; and you'll be able to address
7    the Court if you would like.
8              So let's first go through these
9    objections.  And the first one, again, I granted the
10   Government's objection.  That's been clarified.  The
11   Government also agrees and probation has agreed to your
12   lawyer's first objection which is that the confidential
13   source did not pay you an additional 500.  It was just
14   for the agreed sales price.  So that's been corrected.
15             Objection Number 2, there's this
16   disagreement about you're a type 7 manufacturer
17   licensee.  So the issue is filling out these reports.
18   Your lawyers say you were not allowed to.  The
19   Government says, well, you didn't have to; but you
20   could.  And, in fact, you did previously on a number of
21   occasions.
22             On this one I'm just going to say this
23   doesn't -- this is not going to factor into my decision
24   at all.  So effectively I'll grant the objection, and
25   then I'm not going to consider in my sentencing decision

1    your failure to file these reports.  Although it's not

2    saying -- I mean, this legal issue, I'm not going to

3    decide.   I'm just saying I'm not going to -- I'm not

4    going to rely on your failure to file reports in any way

5    in determining your sentence.

6                    Objection 3, this is where we get into one

7    that actually affects the guidelines scoring; and your

8    lawyers say that you shouldn't have a base offense level

9    of 20; and that was based on -- probation said your

10   offense involved a semiautomatic magazine capable of

11   accepting a large-capacity magazine and that you

12   committed the offense with knowledge, intent or reason

13   to believe that the offense would result in the transfer

14   of a firearm to a prohibited person.

15                    Your lawyers mainly say, well, that's

16   based on these -- this confidential source who came in,

17   two of them, one who was allowed to buy a gun and one

18   who wasn't; and that that shouldn't be relevant conduct.

19   The Government's response says, even putting aside the

20   confidential sources, selling the guns to Horacio

21   Rodriguez would meet this.

22                    So what's your response to that?  I don't

23   know who wants to handle it.

24                    MR. AKERS:  To the Horacio Rodriguez

25   portion?

```
 1              THE COURT:  Right.

 2              MR. AKERS:  So I think it's --

 3              THE REPORTER:  Your name?

 4              MR. AKERS:  Cordt Akers.

 5              I think it's important to note, first,

 6   that that count was Count 16 in this indictment, which

 7   was dismissed before we pled guilty, before we entered

 8   into any sort of deal.  The Government just wasn't going

 9   to go forward on that among other reasons because in

10   their debrief of Ashley Sandoval, the alleged straw

11   person, she said she was on so many pills she could

12   barely remember anything.

13              In terms of --

14              THE COURT:  I thought your own client, the

15   Defendant, admitted when ATF arrested him that Horacio

16   had not passed the background check; and he knew that.

17              MR. AKERS:  So he had not passed -- he had

18   not passed the check apparently because he was flagged

19   for being a user of marijuana, and then it turned out he

20   did pass the background check later.  And then sometime

21   later Ashley Sandoval comes in and purchases some

22   firearms.  You know, she was a first-time purchaser.  I

23   think the reason that count was dismissed was for

24   several reasons, among others.  I don't think with that

25   specific count there's any evidence to suggest
```

 1   whatsoever that Mr. Abdulaziz knew that Horacio was the

 2   actual buyer of those firearms.

 3                    THE COURT:  What's the Government's

 4   response?

 5                    MS. STABE:  Your Honor, that case was

 6   dismissed when we were preparing for trial because we

 7   did not plan to go forward on that particular count in

 8   trial.  However, I would agree, Your Honor, that

 9   Mr. Abdulaziz did state that he -- that Horacio

10   Rodriguez had come into the store; his background had

11   been denied, and then shortly thereafter Horacio

12   Rodriguez comes in with Ashley Sandoval.  During that

13   transaction -- because even if Ashley Sandoval doesn't

14   remember everything, Horacio also gave a statement where

15   he admitted and stated that when he came in

16   Mr. Abdulaziz handed him the firearms.  And Ashley

17   Sandoval hasn't changed her statement even when we did

18   do a proffer.  The fact he came in with Ashley Sandoval,

19   he was providing the money and that at the end of the

20   day, after the sale was done, that the Defendant had

21   handed the firearms to Horacio who had been denied a

22   background check.

23                    But in addition to that, we also put in

24   our response, Your Honor, that on top of all of those

25   things, some of the other behaviors of the individuals

1   in this case should have given the Defendant the reason

2   to believe that it was going to a prohibited person.

3   Because Guillermo Gomez-Lazcano, Memo, he came into the

4   store on several occasions.  He stated that, in his

5   proffer, Gustavo Gomez-Valenzuela came into the store

6   with Isaac Rodriguez.  They came into the store to

7   deliver backpacks full of cash to the Defendant.

8   Gustavo Gomez said that he had been on several occasions

9   to kind of oversee what was happening.  He helped load

10  firearms, the 105 firearms that Javier Cavazos

11  purchased.  He was there and helped to load those into

12  Javier Cavazos' vehicle; and he is, you know, an illegal

13  alien.  He did not speak any English at all.

14          Additionally, Isaac Rodriguez was a

15  prohibited person as well; and he had an ankle monitor

16  on during the times that he was committing all of these

17  offenses in the store.  He was on a bond for a felony

18  narcotics offense.  So for all of those reasons in

19  addition to the fact that we feel the CI purchase should

20  be included in relevant conduct.  That's why we believe

21  Mr. Abdulaziz should still start off at a Level 20.

22          And during those -- and that's why I added

23  that exhibit with that offense report, Your Honor.

24  During the 105 AK -- yes, 105 AK-47s Javier Cavazos

25  bought, those all included a 30-round magazine.  During

1    the purchase that Horacio Rodriguez made, that included,

2    I believe, a 15-round magazine which all of those

3    qualify for that particular definition of the

4    high-capacity -- or the semiautomatic rifle capable of

5    carrying a high-capacity magazine.

6                    THE COURT:  Go ahead.

7                    MR. AKERS:  I know the Court doesn't want

8    to go back and forth, but I certainly have a response.

9                    THE COURT:  This is what I don't

10   understand.  I mean, even forgetting all these -- I

11   mean, there's all these reports, all these interviews.

12   The whole point of a straw purchase is you're giving it

13   to someone who otherwise couldn't buy the gun.  Why else

14   is someone being paid to go into a store and lie that

15   it's not for them unless they're giving -- I mean, it

16   just seems so obvious to me.  The standard is only

17   reason to believe in the guideline.  Reason to believe

18   the offense would result in the transfer of firearms to

19   prohibited person.  That's the whole point.  Or what am

20   I missing?

21                   MR. AKERS:  I think that's -- I mean,

22   reason to believe, I think that's speculative, frankly,

23   would cause Mr. Abdulaziz to speculate -- would be

24   punishing him for frankly negligence because --

25                   THE COURT:  Why would someone -- why would

all these folks, like Horacio Rodriguez and others, be using straw buyers if they could buy them themselves? Why go to the trouble of lying, risking Federal prosecution? I mean, I guess I just don't understand.

MR. AKERS: There could be quite literally thousands, I propose to the Court. Maybe they're --

THE COURT: Thousands of what?

MR. AKERS: Of reasons why they would have someone else buy a firearm.

THE COURT: Give me one.

MR. AKERS: They don't trust the ATF and don't want to be in some sort of registry, that they are not a prohibited person but have cash that they want to utilize and don't want to deposit it into a bank and pay taxes on. There's dozens. And to require Mr. Abdulaziz to know that he's a prohibited person or have reason to believe that he's a prohibited person is, like I said, quite speculative. He's pled under a willful blindness theory that these purchasers were not, in fact, the purchasers.

THE COURT: Well, I guess, when you say he's pled under a willful blindness theory, I mean, the facts are what I -- for sentencing what I find them by a preponderance of the evidence.

MR. AKERS: Correct.

1           THE COURT:  But go ahead.

2           MR. AKERS:  The fact of the matter, Your

3  Honor, is that he was willfully blind that these were

4  not, in fact, the correct purchasers of the gun; but

5  that's where his knowledge stops.  Was he willfully

6  blind about whether Isaac Rodriguez was, in fact, the

7  purchaser of these guns?  He has no reason to believe

8  that Isaac Rodriguez is himself a prohibited person.  I

9  think there's -- she says there's an ankle monitor on

10 him.  That's frankly, number one, the first time I'm

11 hearing about that; but, number two, these are all in

12 the winter.  So absolutely, he's probably wearing pants

13 and covering that up.

14          THE COURT:  Well -- all right.  I think

15 the confidential source buys are -- likely are relevant

16 conduct.  I mean, I don't see it any different than when

17 there's a drug dealer out there.  DEA believes there's a

18 drug dealer out there, and then they send an informant

19 or an undercover agent in; and that is -- that drug

20 quantity is typically included as relevant conduct.  But

21 even if it's not relevant conduct, I certainly think

22 it's evidence that a Court can consider on this

23 question, as you put it:  This all has to do with what

24 Mr. Abdulaziz thought and understood was going on.

25          And so at trial and I think no different

1    at sentencing, you can use other acts to understand

2    someone's intent about what was going on.  And so if the

3    theory is, well, he was just ignorant to all this, let's

4    see what happened with the confidential source.  And the

5    other factor about this evidence is it's a lot more

6    reliable than what some cooperator said in an interview,

7    things like that.

8             The confidential source advised the

9    Defendant that he or she had been convicted of a felony;

10    and the Defendant stated, well, then the confidential

11    source would not pass the background check.  The

12    Defendant then asked Confidential Source 2 if she is

13    over 18, the minimum age to purchase a rifle from a

14    Federal firearm licensee.  The Defendant told the

15    Confidential Source 2 and 1 that he could sell the

16    rifles to Number 2 instead but that Number 2 could get

17    in trouble for giving the firearms to Confidential

18    Source 1.  And then, of course, it's sold to Number 1.

19             Then a few days later or in the next month

20    there are more phone calls from the Confidential Source

21    1, the one the Defendant knew had been convicted -- was

22    told he's been convicted of a felony.  He's the -- CS 1

23    is the person talking to the Defendant, and they're

24    talking about buying more rifles.  Then the confidential

25    sources returned to the gun shop.

1            Source 2, the one who could buy the gun,

2    remained in a vehicle outside the business.

3    Confidential Source 1 entered the building and met with

4    the Defendant to pay the deposit on the heavy-barrel

5    rifle and to purchase a Zastava model semiautomatic

6    AK-47.

7            The Confidential Source 1, the

8    prohibited -- you know, the one the Defendant believed

9    to be prohibited, gave the Defendant a thousand dollars.

10   The Defendant allowed the source to purchase the rifle

11   despite knowing he was a convicted felon, did not

12   require Source 1 to complete the form and did not

13   conduct a background check.

14            And then we know it goes on.  It says

15   Confidential Source 1 said his boss was making him drive

16   all the way to Mexico with the firearms.  Then on

17   April 28th the confidential sources return to the gun

18   store.  They return to ZIA.  The Defendant tells

19   Confidential Source 1 that Confidential Source 2 would

20   need to complete the paperwork and motions for

21   Confidential Source 2, who was not in the store, to

22   enter the store.

23            So to the extent there's any doubt about

24   the Defendant's intent with the actual charged

25   participants, which I don't even think there's much

1    doubt -- I mean, I think reason to believe -- I just

2    think that's the obvious reason why people are using

3    straw purchasers is they themselves are prohibited

4    persons; and you add to that common-sense understanding

5    some of the other facts that have been discussed by the

6    Government, such as Horacio Rodriguez not passing the

7    first background check for approval -- I'm sorry.  I

8    think even without the confidential sources, I would

9    apply the enhancement finding there is reason to believe

10   by a preponderance of the evidence that the Defendant

11   had reason to believe these guns were going to

12   prohibited persons.

13            But the discussion with the confidential

14   sources takes away any possible doubt that exists in

15   even under the beyond-a-reasonable-doubt standard, which

16   is not what applies here.  As you know, I would find he

17   had reason to believe these -- again, because it's --

18   whether it's relevant conduct or not, it certainly is

19   probative evidence of what his intent and understanding

20   was.  So I'm going to deny that objection.

21            MR. HOLLINGSWORTH:  Your Honor?

22            THE COURT:  Yes.

23            MR. HOLLINGSWORTH:  Derek Hollingsworth

24   for the record.  And I know you've ruled, and I'm

25   certainly not going to quarrel with the Court.  The one

1  context, though, that I would offer just because I know

2  that -- even outside the objection for a moment --

3                 THE COURT:  Right.

4                 MR. HOLLINGSWORTH:  -- you know, the

5  confidential sources presented themselves as essentially

6  a father and the girlfriend of his son.  So he's

7  presenting himself as, "Hey, I'm the knowledgeable guy

8  walking in here who knows things about guns; and I'm

9  going to help my son's girlfriend buy a firearm."  I

10  don't think that scenario -- I can pick apart those two,

11  and I'm not trying to quarrel with the Court; but I

12  don't think that scenario is beyond the pale for, you

13  know, a father to come in and be the one that's talking

14  and negotiating and saying things when in reality this

15  is going to be sold to the daughter -- the

16  daughter-in-law.  They're not married, but that's the

17  way they -- none of this was real; but I'm just saying

18  that's the way they presented themselves.  So I do

19  believe there is some level of reasonableness, you

20  know --

21                 THE COURT:  I agree with you.  If a father

22  is going to buy a gun for his kid, no problem.  A

23  convicted felon father -- I mean, a convicted felon

24  should be nowhere near that gun store.  A Federal

25  firearm licensee knows that a convicted felon shouldn't

1    be even in the -- even if it truly was for the son or

2    daughter, a convicted felon shouldn't be in the car with

3    that gun driving it home.  I mean, he knew they came in

4    the same car.  So I --

5                    MR. HOLLINGSWORTH:  I don't disagree; and,

6    again, I feel like there are nuances that I would --

7    that the Court would think about a little bit which is,

8    you know, he never ran his background check.  The guy

9    hands him his license.  He says, "What are you doing?"

10   And he says, "Well, I'm a convicted felon."  I mean,

11   we've both been out in the world long enough to know

12   people sometimes who have committed DWIs think they're a

13   convicted felon.  Sometimes people don't have an

14   appreciation of what that really means.  So I get it.  I

15   do.  I do get it, and your observations are fair; but he

16   never actually ran his background.

17                    I mean, it's not like he popped it up and

18   said, oh, yeah, actually you were convicted of

19   aggravated robbery or possession of a controlled

20   substance with intent to deliver; so you're 100 percent.

21   Again, I know it's -- I get the law is really soft on

22   this "reason to believe."  But with respect to the

23   confidential informant, just like with respect to the

24   straw purchasers, everyone had a story.  Everyone had a

25   story.  They all walked in with some kind of story about

1    being sent there by someone else or having some kind of

2    story.

3              I think what we've -- and I don't want to

4    preview coming attractions; but what we've done is said,

5    "At some point those stories don't make sense."  I mean,

6    at some point, sir -- and Mr. Abdulaziz has --

7              THE COURT:  We can also preview when the

8    ATF comes in and says, "Your guns are being recovered in

9    Mexico."

10             MR. HOLLINGSWORTH:  Yes, sir.  And we

11   would like an opportunity to talk about that at some

12   point.  Again, we've pled guilty.  I know we've accepted

13   the facts.  I just hope today we can put some of it in

14   context.  I know that -- we all know they look bad.

15   That's why we're here today.  But I do think a lot of

16   them do have some context that we hope will impact the

17   Court, whether you -- whether you grant or deny the

18   objections but when we're in phase two.  And I'm sorry.

19   Mr. Akers was really handling this part.

20             THE COURT:  And I -- I mean, I'll back up.

21   I mean, to me, a reason -- it's hard for me to imagine a

22   scenario where a straw purchaser -- there wouldn't be a

23   reason to believe it's -- the gun's going to a

24   prohibited person.  Maybe there's some tax reason or

25   something.  I don't even quite get that.  I mean maybe

1    but a reason to believe.

2                 MR. HOLLINGSWORTH:  But only if you knew

3    they were a straw purchaser.  If you thought that the

4    person was really buying the gun, you wouldn't have any

5    reason to believe they were going to someone else.

6    Right?  I mean, if someone comes in and says --

7                 THE COURT:  Right.  But he pled guilty to

8    knowing they were straw purchasers.

9                 MR. HOLLINGSWORTH:  Exactly.  So I think

10   that's where you're jumping to, and I get that.  I do.

11   I'm saying, you know, I think that it is -- I'm back to

12   I think it's important in whatever phase we deal with

13   this issue that it is really uncontested that a lot of

14   these straw purchasers lied to him and presented

15   themselves as people who wanted to buy firearms

16   legitimately.  I think as time went on and things

17   came -- there's enough red flags where you say, "You're

18   really just putting blinders on"; and that's why we're

19   here.

20                 And, again, I don't want to quarrel with

21   the Court because I think we walk this fine line of

22   accepting full responsibility and being here humbly

23   before the Court; but I think it's fair to raise some

24   context if we can.

25                 THE COURT:  No.  Fair.  And that's -- and

1    you've done a good job within all your filings.

2                I guess I'll reiterate:  That's why I

3    think the confidential source operation is so revealing,

4    because I agree with you in part that it's -- it's

5    difficult -- you know, it's difficult to know what was

6    being said when Giddens and Chapa and all these people

7    are going into the gun store.  We don't know.  We

8    weren't there.  These are people cooperating.  That's

9    always viewed with some suspicion.

10               That's why to me the confidential

11   source -- again, even, you know, if it's irrelevant just

12   a sort of 404(b) evidence of what's in someone's mind,

13   what are they sort of willing to do under normal

14   circumstances.  That to me is why it is so revealing

15   because that's not as impeachable.

16               MR. HOLLINGSWORTH:  Thank you for hearing

17   me.

18               THE COURT:  Let's go on to objection

19   Number 4.  That was granted because that's what, well,

20   shouldn't have exceeded 29.  So objection Number 4 with

21   probation, agreed.  It's been granted.

22               Objection Number 5 is largely a similar

23   issue I think we already discussed.  This is a

24   four-point enhancement for trafficking two or more

25   firearms.  Knowing or having reason to believe, again,

1    that's standard, which I think is even lighter than the

2    deliberate ignorant standard because it's -- it's really

3    almost a should-have-known/had-reason-to-know that such

4    conduct would result in the transport/transfer or

5    disposal of firearm to an individual whose receipt or

6    possession of the firearm would be unlawful.

7                So I really do think my same analysis, I

8    mean, here it just requires two guns, two or more

9    firearms.  But I think my same analysis is why I'm going

10   to overrule this objection.

11               Now we get to Objection 6.

12               Go ahead.

13               MR. AKERS:  I'm so sorry.  The important

14   nuance with this objection as opposed to the one the

15   Court has already ruled on is that it's not a prohibited

16   person under 922(g).  It's a different definition of

17   person whose possession would be unlawful, and that's a

18   very specific -- under the guidelines it's a prior

19   conviction for violence, drugs or domestic violence or

20   at the time was under a sentence of parole.  I mean,

21   that's a very specific reason to believe; and it would

22   require Mr. Abdulaziz to be wildly speculative, not just

23   prohibited persons shouldn't have a gun but those

24   enumerated things in the sentencing guidelines.

25               THE COURT:  Where do you say that:  You

1    had reason to believe that such conduct would result in

2    the transfer to a person whose possession would be

3    unlawful?  Are you saying they have to -- he has to know

4    exactly why their possession would be unlawful?

5                    MR. AKERS:  Well, someone -- a person

6    whose possession would be unlawful is defined.

7                    THE COURT:  Right.

8                    MR. AKERS:  And so he would have to know

9    or have reason to believe that one of those things

10   applied, one of these specific enumerated things, not

11   just prohibited person can't have a gun; but it's

12   defined much more specifically.  And so he would have

13   to --

14                   THE COURT:  But he doesn't have to know

15   the specific reason, does he?

16                   MR. AKERS:  He would have to know that one

17   of them -- one of them are.  So he would have to know --

18                   THE COURT:  He would have to know for some

19   reason their possession would be unlawful.  That's the

20   way I read it.

21                   MR. AKERS:  But it's not in the dictionary

22   definition of possession would be unlawful.  It's

23   defined in the sentencing guidelines as --

24                   THE COURT:  Right.  Because, I mean, most

25   people are -- the most common thing is because you have

```
 1    a felony.
 2                    MR. AKERS:   That's not -- that's not in
 3    the definition.
 4                    THE COURT:   Well, for controlled substance
 5    or a crime of violence.
 6                    MS. STABE:   Your Honor, may I --
 7                    THE COURT:   Yes.
 8                    MS. STABE:   There's two different ways
 9    that you can apply Section B(5).  One is what the
10    Defense is saying, that they knew or had reason to
11    believe the conduct would result in the transport,
12    transfer or disposal of firearm to an individual whose
13    possession or receipt of the firearm would be unlawful;
14    and that's the definition he's talking about --
15                    THE COURT:   Right.
16                    MS. STABE:   -- or who intended to use or
17    dispose of the firearm unlawfully.  And I think in all
18    of the other cases and in this case as well, I'm saying
19    all the other Defendants, I think that second section
20    that the Defendant knew or had reason to believe it
21    would be intended or used unlawfully, that's where I
22    believe the Court has made most of your rulings; and
23    that's where -- when we've cited to United States versus
24    Juarez, 626 F.3d 246, that is also what the Fifth
25    Circuit was focusing on in that case as well, that the
```

1    person doesn't have to specifically know that they're

2    transferring a gun to someone who is a felon convicted

3    of a controlled substance or a misdemeanor crime of

4    violence or under a criminal justice sentence.  They

5    just have to have that reason to believe that person

6    intends to use or dispose of the firearm unlawfully.

7                    THE COURT:  And so why do you say that's

8    the case here?

9                    MS. STABE:  Well, in this case, Your

10   Honor, our argument would be that, you know,

11   Mr. Abdulaziz sold 484 semiautomatic military-style

12   rifles during a nine-month period to eight different

13   straw purchasers that were all sent to the store by

14   Isaac Rodriguez on behalf of Gustavo Gomez-Valenzuela.

15   The firearms were purchased in bulk, sometimes pallets

16   at a time, with 105 firearms in one single purchase.

17   The firearms were all done in bulk cash.  So the amount

18   of money was ranging from thousands of dollars to over

19   $70,000 per purchase.

20                    No straw purchasers ever ordered the

21   firearms themselves; and many stated that -- really not

22   many, all of the straw purchasers stated that when they

23   would arrive at the store, the firearms were already

24   ready to go upon their arrival.  They didn't place any

25   orders themselves.  They didn't even know what they were

1   buying.  And many of the purchasers came back time and

2   time again within days or weeks making multiple

3   purchases at a time.

4                Additionally, in a statement given by

5   Isaac Rodriguez, he told ATF that he paid Abdulaziz

6   additional money on the side, up to $5,000 extra on one

7   purchase in particular and that also Mr. Abdulaziz would

8   contact him when a trace was requested by ATF and warn

9   him.

10               So even if during the dozens of traces

11   done by ATF Abdulaziz had not been informed exactly how

12   each firearm was recovered, as you know, on

13   January 7th a Special Agent Cardona specifically told

14   Abdulaziz that Israel Chapa's .50 caliber was recovered

15   in a large massacre in Mexico.  And, additionally, you

16   had individuals that --

17               THE COURT:  And then what happened after

18   that?

19               MS. STABE:  He continued to sell firearms

20   to the same individuals.  Israel Chapa came back into

21   the store on multiple occasions with Mario Reyna after

22   that interview.  Agent Cardona had asked Abdulaziz to

23   please contact ATF if he saw Israel Chapa or actually

24   Giddens again.  Yet, when Israel Chapa came back

25   multiple times with Mario Reyna, there were no calls to

1   ATF.  He did not notify anyone.  And, in fact, according

2   to Mario Reyna's statement, Mr. Abdulaziz made comments

3   to Israel Chapa about how ATF has him scared; and that's

4   why he's, you know -- the continuation of that sentence

5   would be that's why Mario Reyna is now in the store

6   instead of Israel Chapa because ATF had warned

7   Mr. Abdulaziz.  Mr. Abdulaziz warned Isaac Rodriguez

8   that ATF was aware of what was going on.  So they

9   started finding different straw purchasers than those

10  that had already been --

11              THE COURT:  So maybe now is a good time to

12  discuss -- you said you wanted to discuss the agents

13  saying the guns were found in Mexico.

14              MR. AKERS:  So what he says is that a gun

15  that you sold to Israel Chapa was found in Mexico; and

16  at the end of that conversation Mr. Abdulaziz says, "So

17  should I stop selling to him?"  And the agents tell him,

18  "I can't tell you what to do.  You do whatever it is

19  you -- whatever it is that you do.  You can turn down a

20  sale.  You can sell.  You can do whatever you want to

21  do."  He doesn't specifically say, "Yes.  He's exporting

22  firearms to Mexico.  Stop selling to him."

23              But what Mr. Abdulaziz does is not call

24  Rodriguez to warn him, calls him to say, "I don't know

25  what Israel's doing, but don't send him over here

 1   anymore.  I'm not selling him any more firearms."  And

 2   he never sells Mr. Chapa a firearm ever again.  He shows

 3   up later with Mario Reyna because some of these people

 4   are friends, and they know they're family and all that

 5   stuff; but he does not sell to Israel Chapa again once

 6   he is told by the ATF that there is a possibility that

 7   Chapa may be doing some --

 8              THE COURT:  But doesn't Reyna lie on the

 9   paperwork?

10              MR. HOLLINGSWORTH:  Reyna lies on the

11   paperwork but also lies to Mr. Abdulaziz.  And in our

12   sentencing memorandum, you can see that he's asking

13   Isaac Rodriguez specifically, "Hey, what's the story?

14   What should I be telling them?"  I want -- you know, I

15   think the quote is, "I'll go in there, and I've got to

16   make sure so I don't have any fuck-ups."  Excuse me.

17              THE COURT:  All right.  Again, the

18   standard is whether the Defendant had reason to believe

19   selling these guns would result in the transfer; and I

20   will focus on it in part two.  It was intended to use or

21   dispose of the firearm unlawfully.  And, of course, it's

22   unlawful to export the guns to Mexico.  So I do think

23   the ATF warning -- not warning, just ATF telling him

24   that a gun sold to Chapa had been found involved in a

25   Mexican massacre.  And then Chapa is back in the store

1    having Reyna complete straw purchases of weapons.  I

2    mean, there's also the other facts about the volume.  I

3    mean, these are AK-47s, the volume of them.

4                 So, again, I just don't think reason to

5    believe is that high of a standard.  And here he's

6    actually told they were found in Mexico and used for

7    killing.  So I'm going to deny that objection.

8                 Objection 6 is -- challenges the awareness

9    that the firearms are being exported to Mexico.  For the

10   same reason, I'm going to deny Objection 6.

11                I will grant Objection 7 which is the

12   abuse of a position of trust or special skill.  I mean

13   there are some cases from other circuits saying that

14   shouldn't apply.

15                To me -- and this is really true of all of

16   these objections.  I mean, the lawyers are doing their

17   job; but there really doesn't seem to me to be too much

18   dispute about the facts.  I mean at the margins there

19   are, maybe, about what some of the straw purchasers said

20   to the Defendant; but the conduct is largely agreed

21   here.  It's just a question of how these enhancements

22   apply.  So I will take off this two-point enhancement

23   and grant Objection 7; but it doesn't change the fact

24   that the Defendant was a Federal firearms licensee in

25   committing this crime.  So I'll consider that.

```
1                    So with that, in granting that objection,
2      it changes the guidelines to -- reduces it two points to
3      a 35.  He has no criminal history.  So he's category 1.
4      So I'll adopt -- I'll adopt the presentence report, the
5      adjusted guideline range with the objection I've
6      granted.  It's a total offense level of 35, criminal
7      history category of 1.  That's a recommended range of
8      168 to 210 months.  Does everyone agree that that's the
9      right range for the number I've assigned?
10                        MS. STABE:  Yes, Your Honor.
11                        MR. AKERS:  Yes, Your Honor.
12                        THE COURT:  Okay.  All right.  That's all
13     the technical stuff.  Like I said, I have to make those
14     rulings.  To me I look at sentencing just more in the
15     totality of the circumstances including both the crime
16     and the totality of your life.  So to me we're now at
17     the part that's really the more important part of the
18     hearing, and I'll first hear the Government's
19     recommendation.
20                        MS. STABE:  Your Honor, there is a plea
21     agreement in this case.  So as part of the plea
22     agreement, pursuant to the plea agreement, we are asking
23     that the sentences run concurrently.  We're asking if
24     you're following the plea agreement, Your Honor, to
25     sentence him to 60 months, to the maximum -- the
```

1   statutory maximum in this case; and if you are choosing

2   to follow the plea agreement, we're also asking for a

3   fine of $125,000.

4             You know, this Defendant sold close to 500

5   firearms.  He was making -- if you look at his finances

6   of the -- the amount of sales drastically increased

7   during this time period with all of the sales he was

8   making to straw purchasers.  And so that's why we're

9   asking for the fine in this case.

10            THE COURT:  It doesn't look to me like he

11  has a lot of resources.  I mean, do you have -- from the

12  presentence report, I mean, he owns a modest house.

13            I'm actually glad you're paying attention

14  to fines.  People usually don't.  But it's just not

15  something that usually comes up.  I mean, it's usually

16  for people who have, you know, extensive resources.  I

17  agree with you about the money involved in the crime.

18  I'm not disagreeing with that, but I didn't see -- I

19  mean, the Defendant reported owning his residence and

20  said there was an outstanding mortgage of 19,000.  The

21  home's worth 229,000, which is again a modest home.  I

22  don't see any other significant assets.

23            So the Government's recommendation is five

24  years?

25            MS. STABE:  Yes, based on the plea

1    agreement.

2              THE COURT:  Let me ask you -- I'm looking

3    here.  You know, I have the list of what other people

4    have been sentenced in this case; and, I mean, this

5    Defendant's situation is different in a lot of ways.

6    People can look at that either way, but I'm curious

7    on -- do you remember Isaac Rodriguez?  I mean, he

8    obviously has a criminal history, right?

9              MS. STABE:  He was a category 2, Your

10   Honor, but he doesn't -- he had more -- he had some

11   cases that were pending while he committed this offense.

12             THE COURT:  Right.

13             MS. STABE:  Off the top of my head, I

14   don't -- I don't recall if he had any actual felony

15   convictions at that point.  I think he was a category 2

16   mostly because he had -- because of the addition of the

17   points for committing an offense while you were on bond

18   for other offenses.

19             THE COURT:  Right.

20             MS. STABE:  But that's what he was, and

21   he -- you know, his circumstances are different.  He

22   guidelined, you know, very high as well, Your Honor; but

23   that Defendant cooperated substantially with the

24   Government, and that's why his sentence ended up being

25   the 126 months is because of the 5K motion for a

1  downward departure.  But he was guidelining at around

2  240 months as well for his conduct.

3                    THE COURT:  All right.  I remember that.

4  All right.  Mr. Akers, who wants to speak?

5                    MR. HOLLINGSWORTH:  If it's okay, I will,

6  Your Honor.

7                    THE COURT:  Sure.

8                    MR. HOLLINGSWORTH:  And again for the

9  record, it's Derek Hollingsworth.  You know, thank you

10  for giving us this opportunity today.  I -- you know,

11  we're here under difficult circumstances which you very

12  much acknowledged; and I know that you care a lot

13  personally about sentencings.  I know you take them

14  really seriously.

15                    You know, I appreciate that when you read

16  the PSR that the -- it kind of goes in my view a little

17  bit out of its way to talk about sort of the horrendous

18  consequences of this case, which Mr. Abdulaziz does not

19  take lightly; certainly he didn't know about, but we

20  understand that there were serious consequences.

21                    But, you know, we were really careful,

22  Judge, about the way we crafted this plea; and we did it

23  on purpose.  Willful blindness is a controversial

24  subject matter in criminal cases.  It's essentially

25  convicting someone for what, I think, is reckless

1    behavior.  If we're having a trial, you know, as a

2    defense lawyer, it scares the you-know-what out of you

3    because it -- we think -- you know, often the prevailing

4    thought is it allows the Government to reach a little.

5    But here it provided --

6              THE COURT:  Well, I have an opinion saying

7    it's supposed to be a disfavored instruction; but it

8    keeps coming up.

9              MR. HOLLINGSWORTH:  Exactly.  And I'm

10   aware of that, and I know your feelings about it.  I

11   think here, though, it served the purpose of bridging a

12   gap between us and the Government on some things that we

13   very much disagreed about and were -- as the Court

14   knows, we were pretty close to trial about.

15             And so I meant what I said.  Mr. Abdulaziz

16   and his lawyers, we respect this process; and we accept

17   responsibility for it.  And we can't ignore the

18   consequences of what occurred when really bad people, to

19   some degree, took advantage of Mr. Abdulaziz; but

20   Mr. Abdulaziz admits and understands that he should have

21   100 percent recognized at some point what was going on.

22             But make no mistake about it, and I don't

23   think I should have to apologize for it; but this is not

24   a plan that he hatched.  He didn't sit down with Isaac

25   Rodriguez and say, "Here's what we're going to do.

1    We're going to send in straw purchasers, and I'm going

2    to actually get those guns from the straw purchasers;

3    and then I'm going to send them down to the drug

4    cartel."  That never occurred.  That conversation never

5    occurred at any moment during this.

6              Mr. Abdulaziz was presented with an

7    opportunity hatched by Isaac Rodriguez who said, "I'm a

8    big deal.  I know people in the community.  I'm going to

9    send you business."  That is a business arrangement that

10   does exist in normal everyday society whether you're

11   talking about guns, automobiles, houses, whatever.  That

12   situation exists.  That is what he was told.  And then

13   he began to get people who came in and lied to him,

14   100 percent lied to him.  We have the text messages.

15   They debriefed with the Government.  They all said,

16   "Hey, I was told by Isaac Rodriguez to act like I was a

17   wealthy person who wanted to invest in guns."

18              And Mr. Abdulaziz will tell you that that

19   is a pretty common thing.  People invest in guns.  I

20   don't invest in guns.  I doubt you invest in guns, but

21   you know there's a lot of people who invest in guns.

22   Every time there's a presidential election, no matter

23   which way it swings, it seems like the value of guns

24   goes up.  I think the NRA and the gun industry always

25   wins.  I don't necessarily love it, but it is a fact of

1  life.  So people come in and purchase firearms for
2  investments.
3          Now, what -- the reason we pled guilty is
4  because along the way, when people start coming in and
5  it looks shadier and shadier and shadier, Mr. Abdulaziz
6  and his lawyers recognize that that looks bad.  And if
7  you -- you have a lot of data points at some point where
8  you're -- you know, the ATF tells you one of your guns
9  is recovered in Mexico.  Did he quit selling to that
10  person?  He did.
11          But you're right.  That person comes in
12  with another person; and I think everyone would say,
13  "Hey, when you step back from this and you read this PSR
14  or you read the ROIs, man, it alls comes together like a
15  really nicely knit story."  But that's not the way it
16  all unfolded.  It unfolds a sentence at a time in real
17  life.  Right?
18          So people come in.  You know, what's
19  interesting to me that I've learned about this is the
20  gun industry is filled with kind of interesting people;
21  and many of them don't trust the Government.  Many of
22  them like to buy guns with cash.  A lot of them like to
23  go to gun shows.  I'm not a big fan of the gun-show
24  loophole, but it does exist because people like to go to
25  gun shows and buy firearms because they don't want to

1    have to fill out the paperwork.

2              And by the way, that's perfectly legal.

3    I'd love to change the law.  But a convicted felon can

4    roll into a gun store and buy a gun because if it's a

5    private-party transaction, you don't have to run a

6    background check.  So there are all kinds of interesting

7    nuances in the gun-purchasing community.

8              And so, again, back to -- we chose willful

9    blindness because he never hatched this plan.  Unlike

10   Isaac Rodriguez who you pointed out a minute ago got a

11   pretty stiff sentence, probably not only because of his

12   criminal history but because he clearly hatched this

13   plan.  And every straw purchaser that was sent into this

14   facility knew what was going on.  No one walked in -- I

15   mean, don't get me wrong.  They all lied to the

16   Government agents when they were first asked; but

17   eventually they all said, "Yeah, I knew what was going

18   on.  They told me I was buying a gun for someone else."

19             And most of those straw purchasers have

20   gotten three, two or one years.  I understand we can all

21   make -- we can say they cooperated.  Of course, that

22   helps.  We can say they purchased fewer guns than he

23   supplied overall.  I understand that.  I'm not ignorant.

24   But when you're talking about what's in your head --

25             THE COURT:  They also made a lot less

1　money off of this.

2　　　　　　　MR. HOLLINGSWORTH:  They did, but I will

3　also tell you that it's in the ROIs and it's in the

4　financial records that his -- and we put it in our

5　sentencing memo -- his profit margin on selling firearms

6　is next to nothing; and he did that on purpose setting

7　this case aside.

8　　　　　　　THE COURT:  It was to support his other

9　business.

10　　　　　　MR. HOLLINGSWORTH:  He had a machining

11　business.  So police officers come in and say, "I want

12　'Precinct 5' engraved on the handle."  He can charge

13　$2,000 for that $100 job.  So I know a lot of money went

14　through his shop; but if you actually look at the profit

15　margin, if we had had a trial, we'd have pointed out

16　that he made like a 2 percent profit margin.  I mean

17　just nothing.

18　　　　　　　So you're right.  There is a lot of money;

19　and I think the money raises suspicion, not because of

20　the money he made.  He really didn't make any money off

21　of this.  He's clearly lost money, and I'll talk about

22　that in a minute.  But the money raised -- am I talking

23　too fast?

24　　　　　　　THE REPORTER:  Yes, sir.

25　　　　　　　MR. HOLLINGSWORTH:  I do that.

1          The money raises suspicion because of the
2   amount, and it is undoubtedly a red flag.  But I wanted
3   to -- I wanted to start a little bit with willful
4   blindness because I meant what I said in the first
5   sentence of the sentencing memo which is we take
6   responsibility, but I think it's fair under 3553(a) to
7   consider the context of what happened.
8          There's an article that we cited written
9   by Texas Law Review.  And obviously I know Your Honor
10  went there.
11          THE COURT:  Heard of it.
12          MR. HOLLINGSWORTH:  And it's willful
13  ignorance of criminal culpability, and I think it plays
14  here a little bit.  A person --
15          THE COURT:  I've cited that before.
16          MR. HOLLINGSWORTH:  -- who is certain that
17  his conduct is criminal is more culpable than one who is
18  only aware of a high probability that is the case.  The
19  certain actor is more dangerous because he is less
20  deterrable insofar as he has shown his willingness to
21  violate the law and is more callous in his disregard for
22  the law.
23          Mr. Abdulaziz is not that person.  I think
24  the other co-Defendants here who absolutely knew what
25  was going on, they jumped in with both feet.

1          Again, I understand that we're here having

2   pled guilty; but I am trying to offer some context to

3   what Mr. Abdulaziz's plea means to us.  I think it's

4   important to consider that in light of the fact that we

5   have text messages and people that lied to him and

6   even -- by the way, Isaac Rodriguez who had every

7   incentive in the world when he's cooperating with the

8   Government to get a 5K and reduce his 10-year sentence

9   could have said -- right -- could have said, not

10  truthfully but could have said, "You know, actually we

11  did have some conversations where we talked about the

12  fact that this was -- this was the plan."  And he said

13  to the bitter end up until trial prep, "I lied to him.

14  I think he" -- he said, "I think he knew what was going

15  on because, like, there's so much money; and it's a

16  little shady, but I never told him; no one that I sent

17  in ever told him."

18          And I don't disagree with the Court that

19  the confidential informant pieces are significant.  We

20  didn't plead to them.  I got that.  But I understand why

21  they may be significant, but they too demonstrate a --

22  if you watch the videos -- I don't know that you have;

23  I've watched them a lot -- they demonstrate a very

24  nuanced and carefully crafted story that is meant to

25  result in exactly what happened.  I get it.  He made the

1     decision.  This is not entrapment.  I'll never win that.

2                     But, you know, the main guy is presenting

3     himself like he's a father helping a -- essentially a

4     relative buy a firearm; and he's doing all the talking.

5     And so the fact that she ends up being the purchaser is

6     not that unusual to me.  Now, again, you back up; and

7     you've got the whole story.  It looks horrible, but this

8     stuff is developing sentence by sentence.

9                     Let me talk just a little bit, if I could,

10    about some of the purposes of punishment which I know

11    the Court's aware.  But Gall versus United States, U.S.

12    Supreme Court 2007, made clear that a sentence of

13    imprisonment can oftentimes work to promote disrespect

14    for the law when it is excessive and whenever it is

15    reviewed as merely to dispense harsh punishment without

16    taking into account the real conduct and circumstances

17    involved in sentencing.

18                     Multiple courts across the United States

19    have held that nothing in 3553(a) requires the goal of

20    deterrence to be met through a period of incarceration,

21    and there is no empirical evidence that harsh sentences

22    actually serve a general or specific deterring effect

23    especially for nonviolent offenders.  Again, I know that

24    things resulted in horrible consequences; but he's not a

25    violent offender.

1          In this case, Your Honor, there's -- if we
2    talk about deterrence for a minute, there is absolutely
3    no chance on God's green earth that this man is ever
4    going to reoffend for a variety of reasons.  Number one,
5    it scared everything out of him.  He didn't go into it
6    with the idea of committing a crime.  He lost,
7    obviously, his business.  That's fair.  He should have.
8    He lost his FFL.  That's fair.  He should have.  He is a
9    convicted felon.  He'll never possess a firearm again,
10   but he will never have the ability to do anything like
11   this again.

12          And he's had an entire lifetime of
13   law-abiding behavior.  He's in his late 30s, married
14   with a two-year-old kid, with all of his friends and
15   family here who know him nothing more than being just an
16   ordinary hard-working guy and are shocked by this case.
17   Shocked by the case.

18          Now, he is not going to do anything wrong
19   again; and I will, obviously, point out to the Court --
20   we cited it in our sentencing memo -- that U.S. versus
21   Gain [phonetic] out of the Eastern District of New York
22   pointed the fact that the destruction of a Defendant's
23   business -- and in that case it was a business that the
24   defendant in that case was using to commit a crime --
25   that the destruction and removal and forfeiture of the

1   business was a factor to consider for a variance or a

2   downward departure because it served the purpose alone

3   of specific and general deterrence.

4          Mister -- I think you saw this in our

5   sentencing memo, Judge; but Mr. Abdulaziz one month

6   after his arrest -- so we can all sit back and be

7   skeptical for a minute about people who know they're in

8   trouble and then have a kid.  That's probably a little

9   irresponsible.  You know, Mr. Abdulaziz had a child

10  not -- you know, a month before his arrest roughly.

11  And, you know, if you want to talk about a dark cloud

12  with a slight silver lining, the fact that he obviously

13  couldn't conduct his own business anymore -- his wife is

14  a -- sort of has a fledgling immigration practice; and

15  she was the primary -- going to become the primary wage

16  earner.  He stayed home with his new child.

17         And, you know, I don't want to act like

18  that's a new phenomenon in life -- it shouldn't be --

19  that, you know, a dad stays home; but I think here

20  necessity being the mother of invention, it did.  And so

21  Mr. Abdulaziz has developed this incredibly close

22  relationship.  And to say that it was life-changing,

23  whether it's in my conversations with Khalid, whether

24  it's in my conversations with Mina; with Pamela, his

25  mother; or any of his friends sitting here on the front

1    row, they just noticed a change in his life and not a

2    change in his life like he was out robbing liquor stores

3    and now he had a kid, so he's turning a leaf; but

4    changing his life that maybe he was really

5    tunnel-visioned and focused only on work working 12 to

6    15 hours a day and running a one-man shop that was

7    getting a decent amount of business and not necessarily

8    snapping to.

9                I will say one of his fallacies, as his

10   lawyer, is he doesn't always snap to things.  He sees

11   things a little tunnel-visioned.  Doesn't make him a bad

12   guy.  I say that with a little bit of trepidation

13   because I don't want the Court to think, oh, well, if

14   he's -- if that's the case, then maybe he'll reoffend in

15   some other way.  I don't think that.  I think this whole

16   process has been an eye-opening experience, not

17   obviously but also because his kid has changed his life.

18               I know you have children.  I have

19   children.  You know, ours are at a point now where

20   they're going into college; and so we sometimes forget

21   about -- or I do -- about how special that early --

22   those early years were, and he is experiencing that.

23   And so the idea -- the reason I point this out, I

24   understand that it's relevant for a lot of reasons; but

25   the notion of him spending even a day away from his kid

1   that he has been with now every day for the last two

2   years and he has treasured and enjoyed, but the notion

3   of even spending a moment away from Farris is

4   heartbreaking; and he will do everything he can to make

5   sure that doesn't happen.  It is in and of itself a

6   deterrent enough.

7              I think, Judge, that another big issue

8   with punishment hearings and sentencing hearings is

9   rehabilitation.  I'd point out to the Court that in

10  Tapia versus United States, 2011 case, essentially held

11  that lengthy prison sentences do not serve the purpose

12  of rehabilitation.

13             Additionally, the Court may be aware --

14  and we've cited it in our memo -- about the United

15  States Sentencing Commission's recent study, the largest

16  study of its kind with over 25,000 offenders, found that

17  shorter prison sentences resulted in lower recidivism

18  rates.  We cited the percentages, but basically one of

19  the lowest recidivism rates was a six-month or less

20  sentence; and probation had the lowest of all.  So I

21  don't believe that lengthy prison sentences serve some

22  kind of rehabilitation.  I think it's a pure punishment

23  issue.

24             Mr. Abdulaziz has demonstrated throughout

25  his life that he is capable of being a productive,

1   hard-working citizen.  He is not a person who has some

2   lengthy rap sheet who couldn't make it through high

3   school.  You know, he was born abroad, moves around

4   quite a bit, moves to the United States.  All of the

5   friends and family that knew him growing up describe him

6   as a caring, hard-working good person.  He graduated

7   college at U of H with a real degree, psychology, tough

8   degree; started law school but decided that this gun

9   business which obviously has gone horribly wrong but is

10   a legal, you know, normal enterprises and certainly in

11   the United States was something he wanted to do.

12               And so he is not someone, I think, that we

13   have to lock away and throw away the key.  I don't think

14   that there is anything that any amount of prison

15   sentence can do that is going to rehabilitate him or do

16   anything.  I think that he has made a mistake that he

17   didn't, again, hatch; he fell into.  And he made grave

18   mistakes, and he ignored some warning signs that we all

19   look at; and we say, "Come on, man."  And he realizes

20   that.  But he is not someone that's going -- that is

21   going to need to be rehabilitated or deterred in any

22   way, shape or form.

23               I've pointed out some of the issues with

24   his co-Defendant's sentences.  I think that -- you know,

25   I think that arguments could be made that there are

1   people that were sentenced to 18 months or two years
2   that 100 percent knew that they were doing wrong things
3   and very well will get out and 100 percent do them
4   again.  Because if you're willing to jump in like that
5   knowing from day one that you're committing criminal
6   activity, I think that Mr. Abdulaziz's sentence should
7   be in line with those.
8              The other thing I want to point out is
9   that he, Mr. Abdulaziz, had a number of firearms that he
10  voluntarily relinquished in this case as part of the
11  forfeiture.  Many of them were unconnected to this case.
12  He was someone who also, to the extent he had means to
13  do it, would invest in firearms.  And so if you want to
14  talk about a fine or a punishment, both, he's given up
15  about $175,000 worth of firearms, some of which we've
16  talked to the Government is undisputed are not connected
17  to this case.  And so he's done that voluntarily.
18  Rather than getting in a fight about it, we did that
19  because we don't think a fine is appropriate in this
20  case in light of that 175,000-dollar-voluntary
21  relinquishment.  And we also think it should be
22  considered in his punishment.
23             And I think where I'll end is that I don't
24  want to be remiss in pointing out, as I have a few
25  times, that there are people here on the front row that

1  love and care about Khalid, about Mr. Abdulaziz.

2  They've all written letters.  They're all here to

3  support him.

4          The man in the blue shirt, Josh Roland,

5  was a good friend of his that worked actually in the

6  shop.  And if we'd had a trial, he'd probably be our

7  star witness because he talked about seeing some of

8  these straw purchasers come in and say, "Yeah.  Man,

9  they all acted like they were gun investors."  Now he

10 was not there for all of them.  And, again, I know that

11 eventually they're red flags but a wonderful human being

12 who is in the military, an ex-cop, works at NASA who,

13 you know, was in the shop with him and says, "Hey, man.

14 I'm law enforcement.  If I had noticed anything going

15 wrong, I'd have run them up or walked out," still

16 supports him, loves him to death.

17          His wife, Mina, who is candidly going to

18 be punished vicariously through this -- and I guess

19 "Them's the breaks," as they say -- but, you know, she's

20 got a two-year-old son and an immigration practice.

21 She's a newish lawyer.  And, you know, Khalid has been

22 raising Farris; and now, you know, if he's away, she's

23 going to be figuring that out along with losing her

24 husband.  She's got other friends that -- Pamela is

25 here, his mom, and his stepdad.  You know, they are --

Case 4:20-cr-00026   Document 787   Filed on 08/25/22 in TXSD   Page 48 of 68

1   love him dearly and will support him and certainly don't
2   want to see him locked up.
3              I don't know how to -- how to set the
4   landing here.  You know, I believe, based on everything
5   I know about him, that a term of incarceration for him
6   is not something that's going to rehabilitate him or
7   deter him.  That's -- that's already happened.  I
8   don't -- I know that he doesn't want to be away from his
9   son or his family, but I don't know a way to make that
10  argument credibly.  And so I think that I would ask for
11  a term of -- for the Court to seriously consider a term
12  of incarceration less than what the Government has
13  suggested and to put it somewhere in the 18-month to
14  two-year range and allow him to be near his family.
15             You know, obviously, I think any -- that
16  level of incarceration he's going to feel as if it were
17  20 years because he's going to be away from his son that
18  he's bonded with so closely; but I think that's fair in
19  light of what the co-Defendants have gotten, knowing
20  what they did and going in with both feet and hitting --
21  the way he approached this case.  I think that's in
22  line.  And I think that's all I have to say, and I
23  really -- you're always so kind to listen and patient;
24  and I know you take these cases so seriously, and
25  obviously we leave him in your hands.

1          THE COURT:  All right.  Thank you,

2  Mr. Hollingsworth.

3          Mr. Abdulaziz, this is your chance to say

4  whatever is on your mind if you would like.

5          THE DEFENDANT:  Yes, sir.  I wrote it

6  down.  Excuse me.

7          Honorable Judge Costa, I want to start off

8  by offering my sincere apologies to those who have been

9  affected and hurt by this case.  I now know that some of

10  the guns I sold were smuggled to Mexico and used in

11  violent shoot-outs.  I am ashamed and horrified that

12  this happened and have lost countless hours of sleep

13  over it.  I hope the Court can understand that while I

14  take full responsibility for my role in this criminal

15  activity, I never, ever set out thinking that I was

16  selling guns to straw purchasers or that these guns were

17  being smuggled to Mexico.

18          I certainly now know how bad all this

19  looks in hindsight, and I pleaded guilty because it is

20  clear to me that I ignored all sorts of red flags.  I

21  should have put a stop to these sales, but I

22  deliberately walked the path of ignoring what I was part

23  of; and I accept responsibility for my actions.  There

24  is nothing I wouldn't give to take it back.  I'm sorry

25  for not acting when I should have.

1          This decision to turn a blind eye not only

2    hurt other people that I don't even know; but it also

3    lost me my business, my passion and my life savings.

4    More importantly to me, it hurt those who I care for the

5    most.  My mom had finally landed a dream job and had

6    just started working there.  As soon as she heard of my

7    arrest, she immediately quit her job, drove down from

8    Missouri and stayed to support both myself and my

9    pregnant wife.  My mother remained here for nearly two

10   years away from her friends and family to offer any

11   support that she could.

12          My wife Mina, who was eight months'

13   pregnant at the time, was put under an unimaginable

14   amount of stress due to my arrest and lost nearly all of

15   her life savings as a result of my actions.  More

16   importantly, we were hoping to grow our family even

17   more; but due to my -- due to our age, that may no

18   longer be a possibility.  That's something I'll live

19   with for the rest of my life.  My wife may also be

20   forced to raise our son as a single mom without me

21   around to watch and care for him.  She'll have to double

22   her work load to pay for day care and other expenses.

23   I'm ashamed to know that my actions are going to cause

24   this heartache for the woman who is my life partner.

25   The person I am most fearful of hurting is my

1  two-year-old son.

2          Due to my wife's employment as an

3  attorney, we decided that I would stay home and take

4  care of the baby while she worked.  The silver lining

5  over these past two-plus years is that I've stayed home

6  and been the primary caretaker for Farris, our

7  two-year-old son.  I used to work late into the night in

8  my machine shop, but since my arrest I have been present

9  for nearly every waking second of my son's life.  I've

10  witnessed all of his first words, milestones -- and

11  milestones, and I've been fortunate enough to build an

12  incredibly close bond with him.

13          We do everything together from him falling

14  asleep on my chest every night, running to me so I can

15  kiss his bumps and bruises and our nightly routine of

16  looking for shooting stars and the international space

17  station that's over Houston.  These experiences with my

18  son have been unimagine- -- these -- excuse me.  These

19  experiences with my son have been an incredible blessing

20  that as we get closer and closer to my sentencing may

21  now cause an unimaginable amount of pain.  The thought

22  of potentially not being there for my son to take care

23  of him, play with him, teach him and protect him is a

24  terrible feeling.  The pain it's going to cause him to

25  having me in his life from the time he wakes up until he

1  falls asleep to all of a sudden being gone without an

2  explanation he'll understand is truly heartbreaking.

3                 More than -- more than any -- I apologize.

4  More than any of that is the pain of knowing that it's

5  my fault.  During these past two years I've tried to

6  live as productive of a life as I can.  I've grown in

7  ways I didn't expect -- and will not spend time with my

8  son and wife -- I spend most of my spare time furthering

9  my education by combining my passions of machining and

10 programming with my son's love for anything

11 space-related.

12                 I enrolled in online classes dedicated to

13 machining and programming for the aerospace industry.

14 My hope is to apply these newly learned skills from

15 class as well as lessons learned from my good friend

16 Joshua Roland, an engineer in NASA, regarding geometric

17 dimensioning to rebuild my career, support my family and

18 make my son proud.  Farris is my greatest gift; and my

19 wife, Mina, is my greatest supporter.  They both deserve

20 someone they can be proud of.  Today is not that day,

21 and for that I cannot begin to offer enough apologies;

22 but one day I promise they will be proud.  I wish I

23 could better express the shame and sadness that my path

24 caused me, not for me but for my family.  In the end,

25 Your Honor, I'll accept whatever you think is right.

1          THE COURT:  All right.  Thank you, sir.

2          One factual thing I want to get

3    clarification on, I'll ask the Government first; and

4    then the Defense can respond.  The presentence report

5    says the Defendant, as we've talked about, that ATF

6    contacted him about guns being found in Mexico.  It says

7    on multiple occasions.  So how many times did that

8    happen?

9          MS. STABE:  Well, Your Honor, on -- so

10   on -- when there's a trace when a gun is found in

11   Mexico, the FFL is contacted every single time.

12          THE COURT:  Right.

13          MS. STABE:  Because they have to be the

14   ones that look up the 4473.  They then respond and let

15   ATF know who the purchaser was of that firearm.  That's

16   how the trace is conducted.  So I mean to date -- or

17   until March of 2022 there have been 61 firearms

18   recovered in Mexico.  Now, of course, by April of 2020,

19   whenever Mr. Abdulaziz was arrested, that number was

20   significantly less; but there had been multiple firearms

21   already by that point that had been recovered.

22          Additionally, on January 7th, Agent

23   Cardona specifically -- and I went and listened to the

24   recording again -- specifically told Mr. Abdulaziz that

25   there had been a .50 caliber -- or a gun that he had

1    recovered or sent -- sorry, excuse me -- a gun that he

2    had sent -- sold to Israel Chapa was recovered in a

3    massacre in Mexico; and that was on January 7th of 2020.

4    And after that point, Mr. Abdulaziz still sold over 100

5    more firearms to this group of individuals.

6                THE COURT:  The other thing I wanted to

7    ask for clarification on, it says, "When contacted by

8    ATF for the firearms traces, the Defendant would contact

9    Rodriguez and others to say that they recovered -- law

10   enforcement had recovered firearms at a crime scene and

11   to coach them on what to tell law enforcement if a straw

12   buyer was contacted."  Tell me more about that.

13               MS. STABE:  So according to Isaac

14   Rodriguez Mr. Abdulaziz did contact him and warn him.

15   One particular incident was when the firearm from Israel

16   Chapa was recovered in Mexico, Isaac Rodriguez and

17   Israel Chapa both state that they were in Louisiana

18   casino-gambling.  Mr. Abdulaziz called Mr. Rodriguez to

19   let him know what was going on, that ATF had come and

20   was asking about Israel Chapa; and so at that point --

21   Mr. Chapa actually was supposed to pick up 100 -- the

22   105 firearms.  And according to Mr. Rodriguez, once they

23   got the call from Mr. Abdulaziz that ATF had been asking

24   and that a firearm had been recovered in Mexico, that's

25   when it switched; and Javier Cavazos was sent to the

1    store instead.

2              And we feel that's significant because on

3    the phone conversations there's -- well, on the email

4    exchange between Mr. Rodriguez and Mr. Abdulaziz, there

5    is an invoice; and the invoice is for the 105 AK-47s for

6    around $70,000, and it's in the name of Israel Chapa;

7    and Mr. Abdulaziz had sent that to Isaac Rodriguez.

8    Well, only a few days later Javier Cavazos is the one

9    that actually comes into the store with all of that cash

10   with Gustavo Gomez-Valenzuela, with Isaac Rodriguez; and

11   he buys the 105 while then Mr. Gomez and Isaac Rodriguez

12   are loading all of the firearms into the vehicle.  And

13   so that's that particular incident.  After the warning

14   happens to Isaac, that's then what proceeds to happen

15   after that.

16             Additionally, Isaac had made statements to

17   us during proffers that, you know -- to say that, you

18   know, they were buying them for themselves or that they

19   were buying them for investment purposes.  You know, how

20   many times that happened, I don't know.  There was not a

21   clear statement from Isaac about how many times he was

22   called but just that it had happened, and they had been

23   given information about that -- or that CHL holders are

24   easier because the background isn't needed to be run.

25   Those are the statements from Isaac Rodriguez.

1          THE COURT:  Okay.  Do you want a response?

2          MR. AKERS:  I do.  So those are the

3  statements that are contained in the 302 or the ROI.

4  And as we all know, sometimes ROIs -- I think, you know,

5  the agent's interpretation of writing them down saying

6  it's a warning when in reality it's a call saying, like

7  we talked about, "Israel's apparently involved in

8  something; don't send him over here anymore.  I'm not

9  selling him any more guns."

10          So what the ATF characterizes as, "Hey,"

11  warning, Mr. Abdulaziz most certainly characterizes it

12  as telling him, "Hey" -- because -- it might help if I

13  back up and explain what Rodriguez would do.

14          Rodriguez would contact -- and they had

15  this business relationship where Rodriguez would contact

16  ZIA and say, "Hey, I have a customer" -- and all of

17  these emails say "customer" -- "that wants to buy 20

18  AK-47s.  When can they have them ready?"

19          And Mr. Abdulaziz will say, "Okay.  I'll

20  order them.  They'll be here in a week."

21          And because this store is an

22  appointment-only store, Mr. Abdulaziz would ask

23  Rodriguez who doesn't, you know -- from Mr. Abdulaziz's

24  perspective, wants to stay involved because he just

25  wants to be able to broker these deals and still be able

1    to profit from it, then they would come over and pick up

2    at the store at the appointed time.

3              I get it.  When you back up, it looks

4    really weird that they're just showing up with cash; and

5    they're all sitting there ready.  But if anyone ever

6    went to the store, which we've been to the store, it's a

7    little storefront and then a gigantic machining shop.

8    And so it would make sense that they're going to be

9    ready.  Otherwise, Mr. Abdulaziz is going to be leaving

10   and going to the back with some person that's buying a

11   gun with, you know, 10 to 15 firearms sitting there on

12   the wall; and that's not something he wants to do

13   because he's there by himself.

14             But to directly answer the Court's

15   question, these terms of "warning" and "coaching,"

16   that's just not what happened.  And Mr. Rodriguez would

17   say that, "Yeah, he did call me"; and when he says he --

18   coaching about getting people with a concealed handgun

19   license, that's what I thought he was doing.  It's

20   never, "He coached me."  It's they would have

21   conversations --

22             THE COURT:  But that wasn't objected to in

23   the presentence report.

24             MR. AKERS:  Well, because it's -- they had

25   a discussion about it certainly.  But, you know, now

1    that the Court is focused on the actual wording, it's

2    very -- it's very important to us that the Court

3    understand that coaching and having a discussion is

4    100 percent Mr. Rodriguez's thought about that

5    conversation, not what actually occurred.

6                    THE COURT:  All right.  Thank you,

7    Counsel.

8                    Well, this is, obviously, a heartbreaking

9    situation for you, Mr. Abdulaziz, for your wife, for

10   your son, for your friends whose letters I read.  It's

11   also a heartbreaking situation for the people who have

12   been harmed, sometimes killed because of this crime.  So

13   it's just a terrible situation all around.  And I read

14   all the letters.  You have a lot of people who care

15   about you, who think very highly of you; and I have no

16   reason to doubt everything they say, especially your

17   relationship with your son; and that's -- you know, it's

18   the most important thing you'll do in your life.  So I

19   understand why that's especially a difficult part of all

20   this.

21                   So as I said, I have to give you a

22   sentence that will account for all of these various

23   factors and is sufficient but not more than necessary to

24   take account of your background, the seriousness of the

25   offense, the need for deterrence and some other factors

1    as well.

2                    The Government's recommending five years.

3    Probation was recommending 20 years.  I guess since the

4    guidelines have gone down a bit, they're basically

5    recommending a guideline sentence.  So they'd be

6    recommending a sentence of, you know, roughly 15 years.

7    Your lawyers are recommending less than the Government,

8    probably about two years, I gather, is what their

9    recommendation was.

10                   So I agree entirely that you are, you

11   know, hard-working.  This is the first blip on your

12   record.  There's a lot of good that you've accomplished

13   in your life.  I guess there are three ways though where

14   I think -- where I think I see this case differently

15   than your lawyers do.

16                   The first -- and maybe this one's not so

17   much of a difference; but in a lot of the letters, you

18   know, everyone's calling it a nonviolent crime; and

19   technically that's true.  You didn't engage in violence

20   yourself.  I mean, a lot of the letters and other things

21   seem to almost view it as a -- like paperwork, you know,

22   a bureaucratic error.  I mean, as Mr. Hollingsworth

23   acknowledged, I mean, people died because of this.

24   People may still die in the future because of this.

25   Hundreds of guns being sold to people they weren't

1   supposed to be sold to because there were lies on the

2   ATF form, over 400 guns.  I mean sometimes over 100

3   rifles in a single transaction, hundreds of AR-15s and

4   AK-47s, highly dangerous weapons.

5                So, one, I mean, I just think the offense

6   is of the utmost seriousness; and I don't think anyone

7   needs a reminder of how -- the dangers of gun violence

8   in our country, certainly in Mexico as well.  And the

9   Federal firearms licensees are allowed to sell guns in

10  this country; but they really do hold this key position

11  of making sure that guns are being sold to people who

12  can't have them for the obvious reason that if guns get

13  in the wrong hands really, really bad things can happen

14  that we're all -- we all see on the news all the time.

15  So it's a very serious offense.  That's point one.

16               Point two -- and this is where I'm

17  starting to get into -- disagree with.  I just see your

18  knowledge as -- I don't see it as great or deliberate

19  ignorance.  I think certainly at some point in time --

20  to me the evidence is very, very strong that you knew

21  what was going on here.  And that's, again, why I think

22  the confidential source is so important.  Because, yeah,

23  it is hard to parse through all these statements that

24  are sometimes inconsistent from cooperators.

25               So, I mean, that's why law enforcement

1   does this.  They say, "Let's find out what's really
2   going on because we don't know who we can trust.  Let's
3   find out what's really going on, and so we can do --
4   we're controlling it; and we're seeing exactly what's
5   going on."
6               And I already recited what happened, part
7   of it.  There was a lot of interaction with the
8   confidential source.  I mean, I just don't see any other
9   way to cut it than the father says, "I'm a felon.  I
10  can't have a gun."  And yet interacting really only with
11  him, you agreed to a number of sales.  Again, it's some
12  dangerous weapons.  I also think -- I mean, even putting
13  that to the side, although I think that is -- that
14  really does give insight into what you were willing to
15  do.  The number of weapons, the types of weapons, the
16  comments from -- the information from ATF that these are
17  being found in Mexico, that they were actually being
18  used in a massacre in Mexico, I mean certainly at some
19  point I just think -- I doubt if this had gone to trial
20  I would have given a deliberate ignorance instruction.
21  I think there is certainly plenty of evidence that a
22  jury could have found guilt with just straight-up
23  knowledge of what was going on.
24               And then the third point -- I think this
25  is probably my biggest disagreement with Defense counsel

 1   who are very skilled and have done a very good job for

 2   you here -- is your role in this overall gun trafficking

 3   organization.  I certainly agree Mr. Abdulaziz did

 4   not -- did not create this scheme.  He's not given

 5   points as a leader.  Other people are being given points

 6   for bringing people into it as leaders.  I recognize

 7   that's not the case, but in my mind the Federal firearms

 8   licensee was really the indispensable person in this.

 9          As this case shows, straw buyers are a

10   dime a dozen.  They used a bunch of straw buyers.  They

11   used some for a few months, and then they started using

12   others.  I mean, the sad reality is from what I've seen

13   in this case, I could probably go out on the street

14   outside of this courthouse and talk to a dozen or two --

15   two dozen people and find one or two who'd take some

16   money to be a straw buyer.  I just don't think that's

17   hard to find out there, people willing to take money to

18   actually lie on the forms.

19          What is hard to find is a Federal firearms

20   licensee who is willing to risk his business, risk his

21   liberty to allow people to buy these when they're

22   filling out forms with lies on them.  So I just think

23   that even though you certainly didn't come up with this

24   scheme, you didn't bring others into it, I think your

25   role was critical; and so I -- because of some of those

1  cases, I did take out the abuse of trust, whatever the

2  guidelines technically would say.  You had this key role

3  as being a person who's supposed to ensure that the guns

4  are being bought by people who are allowed to buy them,

5  and you're here because you didn't live up to that duty.

6  So that's why we're here.

7              So one of the things I have to consider as

8  well as the other things I've mentioned is how your

9  sentence compares to others in this scheme, and you do

10 have a different role.  So it's a little hard to exactly

11 compare you to others, but I do think your role is much

12 more significant for the reasons I've said than the

13 straw buyers.  I just -- to me that's not even a close

14 call.  Also some of them cooperated which resulted in

15 some of their sentences.  So when you have the

16 cooperation -- and to me you're a far more integral role

17 in allowing this to happen -- I don't think their

18 sentences are a good comparison.

19             So balancing everything I have to balance,

20 the seriousness of this crime, the history and

21 characteristics of the Defendant, the need to provide

22 deterrence, the need for just punishment, the need to

23 avoid unwarranted disparities with others, I think the

24 sentence that is sufficient but not more than necessary

25 to reflect all those goals, given just -- I just find

1    this to be one of the more serious criminal enterprises

2    that I've come across, I believe that a sentence of ten

3    years is required.

4              I'm going to sentence you on Count 1 to 60

5    months.  Count 2 will be 60 months.  That will run

6    concurrent -- I'm sorry -- that will run consecutive to

7    Count 1.  And then all the other counts will also be 60

8    months that will run concurrent.

9              Let me ask probation.  Is that the right

10   way to do it, the sentencing --

11             THE PROBATION OFFICER:  Yes, Your Honor.

12   That is correct.

13             THE COURT:  I'm not going to impose a

14   fine.  You did turn over all of those firearms.  There

15   is a $100 special assessment on each count.  So that's

16   $600.

17             After you're released from custody, you'll

18   have to serve three years on supervised release.  While

19   on supervised release, you shall not commit another

20   crime; you shall comply with the Court's mandatory and

21   standard conditions adopted by this Court in General

22   Order 2017-01.

23             You may not engage in any occupation

24   involving firearms, and you must not possess firearms or

25   ammunition while you're on supervised release; and

1    really that will be true for the rest of your life

2    because you'll be a felon.

3              What about self-surrender?  I mean, I've

4    allowed other Defendants in this case out on bond to

5    self-surrender.  They haven't faced this length of

6    sentence.  He has complied for over two years.  He has

7    his wife here who is a lawyer which -- strong ties to

8    the community based on that.

9              What's the Government's position?  I

10   assume he wants to surrender.

11             MR. HOLLINGSWORTH:  Yes.

12             MR. AKERS:  He does, and I believe it was

13   part of the plea.

14             MS. STABE:  Your Honor, we're not going to

15   ask him to turn himself in now.  He can self-surrender.

16             THE COURT:  What type of monitoring is he

17   on?

18             THE PROBATION OFFICER:  I know he's on the

19   location monitoring program, Your Honor.  I'm not sure

20   whether it's GPS or voice recognition.

21             MR. AKERS:  GPS.

22             THE COURT:  All right.  I'll allow you to

23   self-surrender.  You'll probably get a date.  The order

24   will come out fairly soon, but it will probably be in

25   six weeks to eight weeks that you'll have to report.

1              I know this is going to be a tough

2    significant sentence.  It is substantially below the

3    guideline range, and so I had to balance everything; but

4    I -- I just have to reiterate that I know how hard this

5    is going to be on you and on your family, on your son.

6              There are people who are never going to

7    see their son again.  There are people who are never

8    going to see their father again because of this conduct.

9    So that's -- that's what's driving this that I have to

10   consider just how the seriousness of your failure to

11   comply with the laws of Federal firearms licensing has

12   led to deaths and, like I said, perhaps more deaths even

13   down the road.  So I take -- this is incredibly

14   difficult, but I just think that's what justice

15   requires.

16              Anything else from the Government?  I know

17   I have the dismissal counts and the forfeiture orders I

18   will sign.

19              MS. STABE:  Yes.  And that was the only

20   thing I was going to say.  Other than that, nothing

21   further from the Government.

22              THE COURT:  What else from the Defense?

23              MR. AKERS:  If we could ask the Court to

24   give a recommendation to BOP that he be placed close to

25   his family, Your Honor.

1          THE COURT:  I will recommend that you be
2     placed as close to your family as possible.  I thought I
3     had the two orders.  Do you have another copy?
4          All right.  This dismisses the counts you
5     did not plead guilty to.
6          MS. STABE:  And, Your Honor, one more.
7     You've admonished some of the other Defendants about
8     waiving their right to appeal.
9          THE COURT:  Right.  I believe, sir, that
10    your plea agreement waived your right to appeal.  If I
11    am somehow wrong about that, you would need to file an
12    appeal within 14 days of judgment being entered.  But I
13    believe the plea agreement waives that, but that is the
14    deadline if you think you still do have the right to
15    appeal.
16          All right.  If there's nothing else from
17    counsel.
18          MS. STABE:  Nothing.
19          THE PROBATION OFFICER:  Your Honor?
20          THE COURT:  Yes.
21          THE PROBATION OFFICER:  We recommend he
22    surrender the location monitoring equipment 24 hours
23    before his date of reporting.
24          THE COURT:  Okay.  Yeah.  I'll sign that
25    too.  I'll sign that too.

1              All right.  Everyone is excused.  Thank
2    you.
3                    (Proceedings concluded.)
4                         * * * * *
5        I, certify that the foregoing is a correct
6    transcript from the record of proceedings in the above
7    matter.
8
     August 25, 2022
9                        /s/MaryNancyCapetillo
                         Signature of Court Reporter
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25